STATE OF NORTH CAROLINA v. JOHN LEE CONAWAY

No. 389A92

(Filed 10 February 1995)

### 1. Jury § 157 (NCI4th)— first-degree murder—jury selection—requirement that defendant pass on remaining jurors after challenges

The trial court did not err during jury selection in a first-degree murder prosecution where the prosecutor passed an initial group of twelve jurors to defendant for questioning; defendant conducted a *voir dire* and exercised peremptory challenges to exclude six of the prospective jurors; the court required defendant to pass on the six remaining jurors; and defendant contends that he may have had further questions for that group. The trial court complied with N.C.G.S. § 15A-1214; defendant's response when asked if he was satisfied with the six remaining jurors was not sufficient to inform the court that he wished to ask additional questions. When a defendant peremptorily challenges some prospective jurors but wishes to continue asking questions of those remaining in the panel before passing them back to the prosecution, he must inform the trial court that he wishes to continue questioning the remaining prospective jurors.

**Am Jur 2d, Jury § 215.**

### 2. Jury § 146 (NCI4th)— first-degree murder—jury selection—preselection instructions

The trial court did not err during jury selection for a first-degree murder by refusing to give defendant's requested preselection instruction where defendant argued that at least one prospective juror was confused about the law governing capital sentencing. The actual instructions given by the judge were substantively similar to those requested by defendant.

**Am Jur 2d, Jury §§ 201, 202.**

### 3. Jury §§ 227, 226 (NCI4th)— first-degree murder—jury selection—challenge for cause—no rehabilitation

The trial court did not err during jury selection in a first-degree murder prosecution by excusing a prospective juror for cause and by failing to allow defendant to rehabilitate this juror. The juror gave conflicting answers about her opposition to the

death penalty and her ability to set aside her own beliefs and follow the law, and defendant failed to preserve rehabilitation for appellate review because he failed to make any request to rehabilitate the juror.

**Am Jur 2d, Jury § 290.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

4. **Jury § 262 (NCI4th)— first-degree murder—jury selection—death penalty—peremptory challenges—removal of hesitant jurors**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to prevent the prosecutor from exercising peremptory challenges to remove prospective jurors who were not challengeable for cause but who nevertheless expressed some hesitancy concerning the death penalty.

**Am Jur 2d, Jury §§ 233 et seq.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

5. **Evidence and Witnesses § 2479 (NCI4th)— first-degree murder—sequestration of witnesses—denied**

The trial court did not abuse its discretion in a first-degree murder prosecution by denying defendant's motion to sequester three codefendants expected to testify against him at trial. Defendant gave no reason for suspecting that the State's witnesses would tailor their testimony to accord with the testimony of previous witnesses, other than the general concern that such tailoring was possible because each codefendant had a stake in the outcome of this case. Further, there is nothing in the record to suggest that any of the codefendants were present in the courtroom during the testimony of another codefendant.

**Am Jur 2d, Trial §§ 240 et seq.**

**Prejudicial effect of improper failure to exclude from courtroom or to sequester or separate state's witnesses in criminal case. 74 ALR4th 705.**

**6. Homicide § 552 (NCI4th)— first-degree murder—refusal to instruct on second-degree murder—no error**

The trial court did not err in a first-degree murder prosecution by denying defendant's request for an instruction on second-degree murder where the evidence supported all of the elements of first-degree murder, including premeditation and deliberation, and no evidence was presented to support a conviction of second-degree murder.

**Am Jur 2d, Trial §§ 1427 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

**7. Jury § 93 (NCI4th)— first-degree murder—possible relationship of juror to codefendant—revealed during trial—no voir dire**

The trial court did not err during a first-degree murder prosecution by denying defendant's motion to *voir dire* a juror at the beginning of the sentencing proceeding on whether he was related to a codefendant who testified against defendant. Although defendant's counsel advised the court that his secretary had received an anonymous telephone call which indicated that the juror was a cousin of the codefendant, defendant did not bring this to the court's attention until nine days later, the case having been heard on four of the intervening days. Given defendant's critical delay in bringing the alleged telephone call to the court's attention and the lack of substantiating evidence, the trial court did not abuse its discretion in denying defendant's motion.

**Am Jur 2d, Jury §§ 195 et seq.**

**8. Criminal Law § 1322 (NCI4th)— first-degree murder—sentencing—parole eligibility**

The trial court did not err in a first-degree murder sentencing proceeding by denying defendant's motion to argue parole eligibility. The North Carolina Supreme Court has consistently held that evidence concerning parole eligibility is not a relevant consideration during jury selection, closing argument, or jury deliberation in a capital sentencing, and *Simmons v. South Carolina*, 129 L. Ed. 133 is limited to those situations where the alternative to a sentence of death is life imprisonment without the possibility of parole.

**Am Jur 2d, Trial §§ 286, 1443.**

Prejudicial effect of statement or instruction of court as to possibility of parole or pardon. 12 ALR3d 832.

9. **Evidence and Witnesses § 2899 (NCI4th)— first-degree murder—cross-examination of defendant—length of prior sentences**

There was no plain error in a first-degree murder prosecution in denying defendant's motion *in limine* to exclude evidence of the length of his prior sentences. Although the Unites States Supreme Court held in *Gardner v. Florida*, 430 U.S. 349, that it is a violation of due process to impose a death sentence based at least in part on information which the defendant has no opportunity to deny or explain, the evidence in this case reflects no evidence that was not known or available to defendant which was relied on by the jury. Defendant chose to testify in his own behalf, the evidence of defendant's prior convictions and sentences was properly admitted for impeachment purposes, and defendant actually addressed the evidence during his own direct examination. Furthermore, there is no evidence that the prosecutor attempted to connect defendant's prior Maryland sentences to improper parole considerations; defendant was the only party to inform the jury of the time remaining on his Maryland sentences.

**Am Jur 2d, Witnesses §§ 484 et seq.**

10. **Criminal Law § 454 (NCI4th)— first-degree murder—prosecutor's argument—parole**

There was no plain error in a first-degree murder sentencing hearing where defendant contends that the prosecutor implicitly argued parole eligibility by reiterating that defendant had been paroled for prior Maryland convictions. The prosecutor's reference to the time remaining on defendant's Maryland sentences was based on properly admitted evidence or a reasonable inference therefrom, the prosecutor referred to defendant's parole as a part of his argument that a life sentence would not be an effective sentence since, according to the testimony of defendant's own expert, defendant could not be helped by the therapeutic or rehabilitative processes available to him in prison, and the argument was not based on future dangerousness but on the ineffectiveness of a prison sentence.

**Am Jur 2d, Trial §§ 575, 576.**

Prejudicial effect of statement of prosecutor as to possibility of pardon or parole. 16 ALR3d 1137.

**11. Criminal Law § 468 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—photographs of victims**

There was no error in a first-degree murder sentencing hearing where defendant contended that photographs of the victims' partially decomposed bodies were not relevant to sentencing and should not have been shown to the jury during the prosecutor's closing argument, but the record reflects only that pictures of the victims while living were shown to the jury during this argument. Assuming that the photographs of the bodies were shown to the jury during the prosecutor's closing argument, all of the evidence properly admitted during the guilt determination stage is competent for consideration by the jury at sentencing, and photographs which depict the circumstances of the murder are relevant and admissible at sentencing.

**Am Jur 2d, Trial §§ 505 et seq.**

**12. Criminal Law § 447 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—condition of victims' bodies**

The trial court did not err in a first-degree murder sentencing hearing by allowing the prosecutor to argue, allegedly while showing the jury photographs of the victims, that the jurors should remember the condition of the victims' bodies when they were removed from the woods seven days after the murders. The prosecutor's alleged use of the photographs and his reference to the condition of the victims' bodies when they were removed from the woods did not exceed the scope of the evidence, and the reference was made as a part of the argument that the victims were unique individuals who were now dead and whose deaths represented a unique loss to their families. Defendant made no showing that the use of the photographs was excessive or repetitive.

**Am Jur 2d, Trial §§ 664 et seq.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

**13. Criminal Law § 463 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—within the scope of evidence**

The trial court did not err in a first-degree murder sentencing hearing by overruling defendant's objection to the prosecutor's

argument that the second victim begged for his life after defendant shot and killed the first. The argument did not exceed the scope of the evidence admitted at trial and was within the permissible scope of jury argument during a capital sentencing procedure.

**Am Jur 2d, Trial §§ 554 et seq.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**14. Criminal Law § 447 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—victims' last thoughts**

The trial court did not err in a first-degree murder sentencing hearing by overruling defendant's objections to the prosecutor's argument that the jury should consider the victims' last thoughts before death. This was the same type of victim impact argument approved by the United States Supreme Court. The prosecutor made no attempt to credit the victims with any particular thoughts; the argument merely served to remind the jury that the victims were sentient beings with close family ties before they were murdered by defendant, it was supported by the facts in evidence or reasonable inferences therefrom, and it was not so prejudicial as to render defendant's trial fundamentally unfair.

**Am Jur 2d, Trial §§ 664 et seq.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

**15. Criminal Law § 442 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—role of jury**

There was no plain error in a first-degree murder prosecution where the prosecutor informed the jury that it was the voice and conscience of the community. This argument encouraged the jury to sentence defendant to death without improperly demanding such action on the basis of the community's desires for a conviction, nor did the argument encourage the jury to sentence defendant to death as a general deterrent to first-degree murder.

**Am Jur 2d, Trial §§ 567 et seq.**

Prejudicial effect of prosecuting attorney's argument to jury that people of city, county, or community want or expect a conviction. 85 ALR2d 1132.

16. Criminal Law § 1347 (NCI4th)— first-degree murder—sentencing—aggravating circumstances—course of conduct

The trial court did not err in a first-degree murder sentencing hearing by instructing the jury on the course of conduct aggravating circumstance where defendant argued that the supporting evidence was duplicative of evidence supporting other aggravating circumstances. There was substantial separate evidence supporting each of the aggravating circumstances. N.C.G.S. § 15A-2000(e)(11).

Am Jur 2d, Criminal Law §§ 598, 599.

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.

17. Criminal Law § 1320 (NCI4th)— first-degree murder—sentencing—aggravating circumstances—instructions—use of same evidence to support more than one aggravating circumstance

There was no plain error in a first-degree murder sentencing hearing where the court failed to instruct the jury that it could not use the same evidence to support more than one aggravating circumstance in light of the substantial separate evidence supporting each aggravating circumstance.

Am Jur 2d, Trial §§ 1441 et seq.

18. Criminal Law § 1340 (NCI4th)— first-degree murder—sentencing—aggravating circumstance—murders in the commission of kidnapping—felony murder not submitted

The trial court did not err during a first-degree murder sentencing hearing in submitting the aggravating circumstance that the murders occurred during the kidnapping of the victims where the prosecutor had refused to request a felony murder instruction during the guilt-innocence phase of the trial. *State v. Cherry*, 298 N.C. 86, prohibits the submission of the underlying felony as an

aggravating circumstance only when defendant is convicted solely of felony murder. N.C.G.S. § 15A-2000(e)(5).

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 46.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

19. **Criminal Law § 1325 (NCI4th)— first-degree murder—sentencing—instructions—mitigating circumstances**

The trial court did not err in a first-degree murder sentencing hearing in its instruction on mitigating circumstances where the court used the Pattern Jury Instruction, which uses the word "may" regarding consideration of mitigating circumstances. Virtually identical challenges to this instruction for the consideration of mitigating evidence in Issues Three and Four have been rejected.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.**

20. **Criminal Law § 1348 (NCI4th)— first-degree murder—sentencing—mitigating circumstances—definition**

The trial court did not err in a first-degree murder sentencing hearing in its definition of mitigating circumstances in its instructions to the jury. The instructions given did not preclude the jury from considering any aspect of defendant's character or background or any of the circumstances of the killing, which defendant may have presented as a basis for the imposition of a sentence less than death.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.**

21. **Criminal Law § 1363 (NCI4th)— first-degree murder—sentencing—mitigating circumstances—defendant conceived in rape**

The trial court did not err in a first-degree murder sentencing hearing by refusing to submit the nonstatutory mitigating circumstance that defendant was conceived when his mother was raped at age thirteen. The trial court properly concluded that the fact that defendant was conceived through rape had no logical rela-

STATE v. CONAWAY

[339 N.C. 487 (1995)]

tionship to his moral culpability for these murders and the court based its decision at least in part on the fact that there was no evidence that defendant even knew of the circumstances of his conception prior to the murders.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.**

**22. Jury § 103 (NCI4th)— first-degree murder—jury selection—individual voir dire and sequestration of prospective jurors**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion for individual *voir dire* and sequestration of prospective jurors.

**Am Jur 2d, Jury § 197.**

**23. Jury § 141 (NCI4th)— first-degree murder—jury selection—parole eligibility—questions not allowed**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to *voir dire* prospective jurors about their misconceptions concerning parole eligibility for a sentence of life imprisonment.

**Am Jur 2d, Jury §§ 201, 202.**

**24. Constitutional Law § 371 (NCI4th)— first-degree murder—death penalty—constitutional**

The North Carolina death penalty is constitutional.

**Am Jur 2d, Criminal Law § 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**25. Criminal Law § 1373 (NCI4th)— first-degree murder—death penalty—not disproportionate**

A death penalty for two first-degree murders was not disproportionate where the aggravating circumstances were supported by the evidence, nothing in the record suggests that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and the death penalty was proportionate to other cases in which the death penalty was affirmed, considering both the crime and the defendant. In this case, defendant deliberately set out to steal a car; he looked around the streets of Hamlet

STATE v. CONAWAY

[339 N.C. 487 (1995)]

for a suitable target and intentionally robbed the Pantry and kidnapped the two victims at gunpoint; he stole a car from one of the victims and used it to drive the victims to an isolated spot outside Hamlet; he ordered the two victims to get out of the car and follow him into the woods, where he forced them to get down on their knees and then deliberately shot both victims in the back of the head at close range; and, after he shot the first victim, the second victim begged defendant for his life before being killed. The record is devoid of any evidence suggesting that defendant showed any concern for the lives of his victims or any remorse for his actions; he did not seek any medical attention for his victims or cooperate with the authorities; the evidence showed that defendant fled the state after the murders and continually denied his participation in these crimes after his arrest; and the evidence further showed that defendant committed these murders in the perpetration of two other felonies, first-degree kidnapping and armed robbery, and that these murders were coldly calculated and planned to eliminate any witnesses to his crimes.

**Am Jur 2d, Criminal Law § 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

Justices LAKE and ORR did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Helms, J., at the 5 October 1992 Special Criminal Session of Superior Court, Richmond County, upon a jury verdict of guilty of two counts of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for two counts of first-degree kidnapping, one count of robbery with a dangerous weapon, and one count of misdemeanor larceny was granted 20 December 1992. Heard in the Supreme Court 13 September 1994.

STATE v. CONAWAY

[339 N.C. 487 (1995)]

*Michael F. Easley, Attorney General, by Thomas J. Ziko, Special Deputy Attorney General, for the State.*

*DeVore & Acton, P.A., by Fred W. DeVore, III, for defendant-appellant.*

PARKER, Justice.

Defendant was tried capitally on indictments charging him with the first-degree murders of Paul DeWitt Callahan and Thomas Amos Weatherford. The jury returned verdicts finding defendant guilty of both counts of first-degree murder on the theory of premeditation and deliberation. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death for each murder. Execution was stayed on 16 November 1992 pending defendant's appeal. The jury also found defendant guilty of the first-degree kidnapping of Paul DeWitt Callahan, the first-degree kidnapping of Thomas Amos Weatherford, robbery with a dangerous weapon, and misdemeanor larceny. The trial court sentenced defendant to forty years' imprisonment for kidnapping Paul DeWitt Callahan, forty years' imprisonment for kidnapping Thomas Amos Weatherford, forty years' imprisonment for robbery with a dangerous weapon, and two years' imprisonment for misdemeanor larceny, each sentence to run consecutively. For the reasons discussed herein, we conclude the jury selection, guilt-innocence phase, and sentencing proceeding of defendant's trial were free from prejudicial error; and the death sentence is not disproportionate.

On the evening of 22 August 1991, Thomas Amos Weatherford and Paul DeWitt Callahan were in the Pantry store located on Highway 177 South in Hamlet, North Carolina. Weatherford was working as the night-shift clerk. Callahan, his roommate, had driven Weatherford to work at 11:00 p.m. and stayed at the store with him for several hours that night.

On 22 August 1991, defendant was living with his girlfriend at the Tall Pines housing project in Hamlet, North Carolina. Defendant, who was on parole for crimes committed in Maryland, had moved to North Carolina during the summer of 1991 to help take care of his grandparents, who lived nearby in Rockingham, North Carolina. Defendant's move to North Carolina violated the conditions of his Maryland parole because he had not received permission from his parole officer for the move. Evidence showed that defendant had stolen a .25-caliber handgun from his grandmother's purse prior to 22 August

STATE v. CONAWAY

[339 N.C. 487 (1995)]

1991, which also was in violation of the terms of his Maryland parole. Defendant kept the handgun in a drawstring bag at his girlfriend's apartment.

During the afternoon of 22 August 1991, defendant went shopping in Rockingham with Kelly Harrington and Ralph Crump. That evening defendant also met Michael McKinnon and Kevin "Keith" Scott in Rockingham. The men returned to Hamlet, and defendant met McKinnon, Harrington, and Scott in the parking lot of the Quail Hollow housing project. Quail Hollow is located across the street from the Tall Pines project where defendant was living with his girlfriend.

Around 10:00 p.m., the four men went to the West Hamlet Grocery Store on their way to Scott's house. Defendant, who was the only one in the group old enough to purchase alcohol, bought a six-pack of Bull malt liquor in sixteen-ounce cans and a liter of Wild Irish Rose fortified wine. The four men then went to Scott's house, which was located about half a mile from the store in the Taylor Place neighborhood. They sat on the front porch and drank all of the alcohol as they discussed taking a trip to Washington, D.C., New York, and New Jersey. Defendant expressed his desire to obtain a car so he could get back to Washington, D.C. At that time, defendant's only means of transportation was a bicycle he used to get around Hamlet and to visit his grandparents in Rockingham.

After consuming all of the alcohol, the four men walked back to the Tall Pines housing project so that defendant could talk with his girlfriend. He went inside the apartment for several minutes while the other men waited outside. When he returned, he was carrying a blue or red drawstring bag. He told the other men that he was fighting with his girlfriend, whom he was supposed to marry the next weekend, and that the police had come to her apartment looking for him. As the four men walked away from the Tall Pines housing project, defendant asked the others if they knew where he could get a car to use to get back to Washington, D.C. When the others told him that they did not know where he could obtain a car, he indicated that he could get one without specifying how he would do so. Defendant kept saying, "I got to do something."

The evidence showed that the four men began to walk around the streets of Hamlet. Defendant started looking for a car he could steal to drive back to Washington, D.C. He went into the street twice with the intention of flagging down a car and stealing it, but was unsuccessful both times.

**STATE v. CONAWAY**

[339 N.C. 487 (1995)]

Sometime between 1:30 a.m. and 1:45 a.m. on 23 August 1991, the four men went to the Pantry store on Highway 177 South in Hamlet. Defendant told the other men to wait outside while he went into the store to get more beer. While inside the Pantry, defendant stole $78.00 from the cash register and kidnapped Weatherford and Callahan at gunpoint.

McKinnon, Harrington, and Scott all testified at trial that several minutes after defendant left them to go into the Pantry, he drove up in a dark-colored car. This car was later identified as belonging to Callahan. The two victims were in the front seat of the car with defendant, who was pointing a gun at them. Defendant told McKinnon, Harrington, and Scott to get into the car. The three men got into the backseat of the car, and defendant drove away from the Pantry.

Defendant drove around Hamlet and out onto Highway 74 towards Fayetteville. He asked the victims about the condition of the car and whether it would make it to Florida, threatening them that if they lied to him about the car, he would kill them. He also threatened to "burn their a—" if they tried to turn their heads to look at the three men in the backseat of the car. He handed the gun to McKinnon, who put the gun between the victims' faces to show them it was real. McKinnon then gave the gun back to defendant, who slapped at least one of the victims on the head with the gun.

After defendant passed the Coca-Cola plant on Highway 74, he stopped the car on the side of the road in an isolated area and said, "This is a good spot right here." He told the victims that he had to go to the bathroom and ordered them to get out of the car. McKinnon, Harrington, and Scott remained in the car, while defendant walked the victims into the woods. McKinnon, Harrington, and Scott were unable to see defendant once he entered the woods, but they heard two gunshots fired several seconds apart.

The State's evidence tended to show that after getting out of the car, defendant walked the victims eighty-seven feet into the woods. He ordered the victims to get on their knees, and he shot both of them one time at point-blank range in the back of the head. The evidence did not indicate which victim was shot first. When defendant returned to the car, he told the other three men that he had made the two men get on their knees and shot them both in the back of the head. He also told the other men that after he shot the first man, the second victim begged defendant for his life before defendant killed him. Defendant

stated that "them m——— f——— don't deserve to live." He also told the other three men that they had nothing to worry about because "deadmen can't talk."

At approximately 1:45 a.m. on the morning of 23 August 1991, R.L. Wheeler and Gary Allen stopped at the Pantry on Highway 177 South in Hamlet. When they were unable to find the clerk anywhere on the premises of the store, they called the police. Officer Amery Griffin and Officer Don Norton of the Hamlet Police Department answered the call and arrived at the Pantry at 2:00 a.m. When they arrived at the Pantry, they were unable to locate either of the victims, both of whom they had seen in the store earlier that night as they drove by the Pantry on patrol. The officers found the cash register closed, with a "no sales" receipt on it indicating that the cash register had been opened but no sale had been made. The manager of the Pantry subsequently determined that approximately $78.00 had been stolen out of the cash register. Nothing else was missing from the store.

On 29 August 1991, Army Sergeant Daniel Poe was flying his ultralight plane near Hamlet looking for his lost dog. He was flying at a height of approximately five hundred feet over Highway 74 when he noticed something white on the ground in the woods. Poe took a closer look and saw the victims' bodies lying on the ground in the woods about eighty-seven feet from Highway 74. Sergeant Poe landed his ultralight plane and called the police.

SBI Special Agent Aprille Sweatt investigated the crime scene. She testified that she observed the bodies at the scene and that both victims had been shot in the left back side of the head. Agent Sweatt supervised the search of the area and took custody of all the physical evidence found at the crime scene.

Detective Sam Jarrell of the Hamlet Police Department examined the crime scene using a metal detector and found two .25-caliber semiautomatic shell casings and a .25-caliber lead projectile. He testified that one of these shell casings was found approximately four feet beyond the victims' heads.

After the murders defendant and the three other men drove to Washington, D.C. Harrington got into the front seat with defendant and took turns with defendant and McKinnon driving the car. The men stopped at a gas station in Fayetteville, North Carolina; at another filling station near Smithfield, North Carolina; and at a Denny's restaurant in Virginia.

STATE v. CONAWAY

[339 N.C. 487 (1995)]

The men arrived in Washington, D.C., around 8:00 a.m. on 23 August 1991. Defendant visited with his brother and stepfather that afternoon. None of the men had brought any clothes with them from North Carolina, so defendant and McKinnon went and bought some clothes and toothbrushes. Late that afternoon, defendant went to Cambridge, Maryland, to visit two friends and to see his mother.

McKinnon, Harrington, and Scott stayed with defendant's brother and with Harrington's cousin Darlene for two nights and then went to Maryland to stay with Harrington's brother. The three men returned to Hamlet on or about 30 August 1991 and confessed their participation in these murders to the Hamlet police.

On 25 August 1991, while standing on the street talking to a friend from prison, defendant was arrested in Cambridge, Maryland. Defendant attempted to elude the Maryland police. Officer Thomas Hurley of the Cambridge Police Department chased defendant into some weeds near a cemetery. When defendant was searched, a .25-caliber handgun and six .25-caliber rounds of ammunition were found in his possession. Defendant initially claimed that the police officers planted the gun on him, but later he told Officer Hurley that he had taken the gun out of his grandmother's purse when he was in Rockingham, North Carolina. When he was arrested, he told Officer Hurley that he knew he was "going away for a long time."

SBI Special Agent Eugene Bishop, who was accepted by the trial court as an expert in forensic firearms identification, conducted a forensic examination of the .25-caliber handgun found in defendant's possession when he was arrested. Agent Bishop testified at trial that the gun casings found at the crime scene had been fired from defendant's handgun.

Chief Medical Examiner John D. Butts performed the autopsy on Amos Weatherford and determined that he died from a single gunshot wound to the back of the head. Dr. Butts also supervised the autopsy of Paul Callahan, who also died from a single gunshot wound to the back of the head. Dr. Butts, who was accepted as an expert in pathology at trial, testified that the two men would have died or been rendered unconscious almost immediately after being shot.

Detective Sam Jarrell testified that on 31 August 1991, he traveled to Cambridge, Maryland, where he retrieved a brass key that had been found in defendant's possession at the time of his arrest. Detective Jarrell used this brass key to unlock the front door to the victims' apartment in Hamlet, North Carolina.

The State's evidence further tended to show that while he was in the Richmond County jail awaiting trial for these murders, defendant had an argument with another inmate, Boyd Bostic. Bostic was in a solitary confinement cell because he had been to the dentist and was on medication. Defendant was in a nearby cell, banging on the walls and making a lot of noise. Bostic asked defendant to stop making so much noise. An argument ensued, during which defendant told Bostic that "I done (sic) killed two m——— f——— already."

At trial, defendant admitted that he had previously been convicted of five counts of breaking and entering and two counts of unauthorized use of a motorized vehicle. He testified that he had received a combined sentence of thirty-nine years for these crimes and that he had been paroled on 25 October 1990.

At the close of the State's evidence, defendant moved to dismiss all charges against him. The trial court denied the motion.

Defendant's evidence included his own testimony. He stated he moved to North Carolina in July 1991 to help care for his grandmother, who lived in Rockingham. Defendant testified that he did not participate in the murders of Amos Weatherford or Paul Callahan. He further testified that he did not learn about the murders until he was moved from the Dorchester County jail in Cambridge, Maryland, to Baltimore, Maryland, after being arrested on 25 August 1991 for violating his parole.

Defendant testified that in early August 1991 he stole a loaded gun from his grandmother's purse because of a fight he had gotten into at a Rockingham basketball court. During the rest of the time he was in North Carolina, he carried the gun with him in a little red bag.

Defendant indicated that in early August of 1991, he moved in with his girlfriend at the Tall Pines housing project, where he was living on 22 August 1991. Defendant admitted spending much of that evening with Harrington, whom he had known in Washington, D.C., and with McKinnon and Scott, whom he had just met that day. The men initially met in Rockingham, where defendant had gone shopping. Defendant testified that the only means of transportation he had at that time was a bicycle.

According to defendant's testimony, when he returned to Hamlet on 22 August, his girlfriend told him that the police had come to her apartment looking for him. They argued, and defendant went to his girlfriend's apartment and packed his bags. He left his bags inside the

apartment and met McKinnon, Harrington, and Scott across the street, in the parking lot of the Quail Hollow housing project. Defendant purchased beer and fortified wine at the West Hamlet Grocery Store, and the four men went down the street one half of a mile to Scott's house in the Taylor Place neighborhood. They sat on Scott's front porch and drank all the alcohol.

Defendant further testified that when they left Scott's house, they walked back towards Tall Pines. The men talked about taking a trip to Washington, D.C., New Jersey, and New York. Defendant told Harrington about his fight with his girlfriend. Defendant claimed that when the men got to Tall Pines, Scott and McKinnon indicated they were going to walk Harrington halfway to South Hamlet, where he was staying with a friend. Defendant testified that he gave Harrington his gun for protection during his walk to South Hamlet. He claimed that he did not see the handgun again until the early morning hours of 23 August 1991, when Harrington put it back into his red bag during the drive to Washington, D.C.

After the other men left Tall Pines, defendant went back into his girlfriend's apartment. Defendant claimed that he got into another argument with his girlfriend and then left. He sat on a park bench near the apartment and drank another beer. From where he was sitting, defendant could see the road between Tall Pines and Quail Hollow. After a while, a black car pulled up. Defendant identified this car as the one later determined to belong to the victim, Callahan. Defendant testified that Scott, McKinnon, and Harrington were all in the car when it pulled up to the Tall Pines housing project.

Defendant testified that Scott, who was driving the car, hollered at defendant to come get in the car. Defendant ran over and got into the back of the car on the passenger's side. Scott told defendant that the car belonged to his uncle.

Defendant testified that the men drove around for a long time. They stopped at a gas station in Fayetteville, North Carolina, and all four of them went into the gas station. He claimed that by this time, he knew they were going to Washington, D.C.

Defendant drove the car when they left Fayetteville on Interstate 95 North. He took turns with McKinnon and Harrington driving the car to Washington, D.C. During the time defendant was driving, Harrington returned his .25-caliber handgun to defendant's red bag.

When the men got to Washington, D.C., defendant put his red bag with the handgun inside it into the trunk of the car.

The four men visited defendant's stepfather and brother; and then, as none of the men had brought anything with them from North Carolina, defendant and McKinnon went downtown and bought them all some clothes and toothbrushes.

Defendant left Washington, D.C., late that evening to go to Cambridge, Maryland, to visit some friends and to see his mother. McKinnon, Harrington, and Scott stayed in Washington, D.C., at defendant's brother's house. Defendant drove the car to Cambridge. Defendant testified that he told the other men he would return in a few hours, but car trouble prevented him from returning to Washington, D.C., for several days.

Defendant spent two days in Cambridge, Maryland, before his arrest on 25 August 1991. At the time of his arrest, he was carrying the .25-caliber handgun he stole from his grandmother's purse. Defendant was standing on the street talking to a man he had known in prison when he was approached by Officer Hurley of the Cambridge Police Department. He testified that he attempted to run away from Officer Hurley because he had a gun in his possession and knew that he was in violation of his parole. Defendant testified that he had twenty-three years to serve on his sentence if he was caught violating his parole. On cross-examination, defendant indicated that he did not attempt to throw the gun away while he was being chased by the police because it was his grandmother's and that if anything had been done with the gun, it could be traced back to his grandmother.

On cross-examination, defendant admitted that he violated the terms of his parole by quitting his job and moving from Maryland without permission from his parole officer. He claimed the reason he told Officer Hurley that he was going away for a long time was because he knew he was in violation of his parole and had twenty-three years left on his sentence.

Further during cross-examination, defendant denied ever speaking with Boyd Bostic or confessing to committing these murders to him in the Richmond County jail while awaiting trial.

At the close of all the evidence, defendant renewed his motion to dismiss all the charges against him. The trial court denied this motion. The jury found defendant guilty as charged on all counts.

STATE v. CONAWAY

[339 N.C. 487 (1995)]

Evidence relevant to the sentencing proceeding of defendant's capital trial will be addressed later in this opinion.

JURY SELECTION ISSUES

[1] Defendant first contends that the trial court committed reversible error by failing to afford him the opportunity to make a full inquiry into the fitness and competency of all the prospective jurors during jury selection, thereby depriving him of the right to a trial by a fair and impartial jury. After questioning a number of prospective jurors during jury selection, the prosecutor passed an initial group of twelve jurors to defendant for questioning. Defendant conducted a *voir dire* of this initial group, after which he thanked all the prospective jurors in the panel and exercised peremptory challenges to exclude six of these prospective jurors. The following exchange then took place:

THE COURT: All right; are you satisfied with the remainder?

MR. SHARPE [defense counsel]: Are we going to be required to pass on them now? I didn't know whether we would be required to pass on them.

THE COURT: Yes, you have to pass on them.

MR. SHARPE: (No response).

THE COURT: You have to pass on them.

MR. SHARPE: We're satisfied.

Defendant claims that exchange with the trial court required him to pass on the remaining prospective jurors in the initial group without allowing him to make any further inquiry into their fitness and competency to serve on his jury although he may have had further questions he wished to ask of them before passing them back to the State. For the following reasons, we reject defendant's argument.

A review of the record reveals that the trial court complied with the statutory procedure for selecting the jury. Section 15A-1214 of the North Carolina General Statutes governs the jury selection process and provides:

(d) The prosecutor must conduct his examination of the first 12 jurors seated and make his challenges for cause and exercise his peremptory challenges. If the judge allows a challenge for cause, or if a peremptory challenge is exercised, the clerk must immediately call a replacement into the box. When the prosecu-

tor is satisfied with the 12 in the box, they must then be tendered to the defendant. Until the prosecutor indicates his satisfaction, he may make a challenge for cause or exercise a peremptory challenge to strike any juror, whether an original or replacement juror.

(e) Each defendant must then conduct his examination of the jurors tendered him, making his challenges for cause and his peremptory challenges. If a juror is excused, no replacement may be called until all defendants have indicated satisfaction with those remaining, at which time the clerk must call replacements for the jurors excused. The judge in his discretion must determine order of examination among multiple defendants.

(f) Upon the calling of replacement jurors, the prosecutor must examine the replacement jurors and indicate satisfaction with a completed panel of 12 before the replacement jurors are tendered to a defendant. Only replacement jurors may be examined and challenged. This procedure is repeated until all parties have accepted 12 jurors.

N.C.G.S. § 15A-1214(d)-(f) (1988). This scheme requires the prosecution to indicate satisfaction with a complete panel of twelve before tendering it to the defendant, while allowing the defendant to exercise challenges, indicate satisfaction with the remaining jurors, and pass a partial panel back to the prosecution.

The trial court complied with this statute in the instant case. Although initially the trial court mistakenly required the prosecution to pass on the remaining jurors in the panel before proceeding with the examination of any replacement jurors, in violation of N.C.G.S. § 15A-1214(d), it corrected this mistake prior to the time the prosecution first passed the completed panel to defendant for questioning. Defendant conducted an extensive *voir dire* of the twelve prospective jurors on the initial panel after it was passed to him by the prosecution. After asking these twelve prospective jurors a series of consecutive questions, defendant thanked each of them and used peremptory challenges to remove six of them from the panel. At this time, in compliance with N.C.G.S. § 15A-1214(e), the trial court asked defendant if he was satisfied with the remaining jurors. Rather than answering the judge's question, defendant asked if he was going to be required to pass on the remaining jurors now and commented that he did not know whether he would have to pass on the remaining jurors at that time. This response was insufficient to inform the trial court

that defendant wanted to ask additional questions of the remaining jurors before passing them back to the prosecution. Defendant's comment was reasonably interpreted by the trial court as an indication of uncertainty on the part of defendant about the requirement in N.C.G.S. § 15A-1214(e) that he indicate satisfaction with all the remaining jurors before passing the panel back to the prosecution for examination of replacement jurors. The trial court's statement that defendant had to pass on the remaining jurors was an attempt to explain the jury selection procedure to defendant, not an attempt to cut off further questioning of the remaining prospective jurors before passing them back to the State if defendant so desired.

Although no particular form for motions and objections is required to preserve an issue for appeal, a party must make his or her objection to a ruling clearly known to the trial court. N.C.G.S. § 15A-1446(a) (1988); N.C. R. App. P. 10(b). When a defendant peremptorily challenges some prospective jurors but wishes to continue asking questions of those remaining in the panel before passing them back to the prosecution, he must inform the trial court that he wishes to continue questioning the remaining prospective jurors. In the instant case, defendant failed to object to the trial court's statement that he must pass on the remaining jurors or to clarify for the trial court that he was asking to continue questioning the prospective jurors rather than expressing uncertainty about the jury selection procedure.

As the trial court acted in compliance with the jury selection procedure set forth in N.C.G.S. § 15A-1214 and reasonably interpreted defendant's comment to be an expression of confusion about the jury selection procedure, the trial court's action was not error, and this assignment of error is overruled.

[2] Defendant next contends that the trial court erred when it denied his motion that a preselection instruction be given to all the potential jurors to clarify the law governing capital sentencing. Defendant argues that at least one prospective juror was confused about the law governing capital sentencing and that the questioning of this prospective juror created an unacceptable risk that other jurors could have become confused during the jury *voir dire*. Defendant submitted a proposed instruction to the trial court he claims would have eliminated this confusion and clarified the capital sentencing law for the prospective jurors. We find defendant's contention to be without merit.

STATE v. CONAWAY

[339 N.C. 487 (1995)]

The trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled, and its rulings in that regard will not be reversed absent a showing of an abuse of its discretion. *State v. Black*, 328 N.C. 191, 196, 400 S.E.2d 398, 401 (1991); *State v. Johnson*, 298 N.C. 355, 362, 259 S.E.2d 752, 757 (1979). A review of the record indicates that the trial court correctly instructed the potential jurors about the law governing the capital sentencing process. The actual instructions given by the trial judge were substantively similar to those requested by defendant. Defendant's argument is purely speculative. The trial court did not err in refusing to give defendant's requested preselection instruction, and this assignment of error is overruled.

**[3]** Defendant next contends that the trial court erred in excusing prospective juror Watkins for cause upon the State's motion and by failing to allow defendant to rehabilitate this prospective juror. The transcript indicates that during the State's *voir dire* of prospective juror Watkins, the following exchange occurred:

Q.   . . . .

   Mrs. Watkins?

A.   Juror #10: Yes (nods).

Q.   Do you believe in the death penalty?

A.   Juror #10: No.

Q.   Can you think of—would you automatically vote against the death penalty no matter what the State would prove to you in a case?

A.   Juror #10: It depends.

   . . . .

Q.   You told me you didn't believe in the death penalty?

A.   Juror #10: No (nods).

Q.   Would you automatically vote for life in prison if those were the only choices you've got; would you automatically vote for life in prison?

A.   Juror #10: Yes.

Q.   Could you consider the death penalty as punishment in a first degree murder case?

**STATE v. CONAWAY**

[339 N.C. 487 (1995)]

A.   Juror #10: Yeah (sic).

THE COURT: Let me ask you, you seem to be giving inconsistent answers.

You say you would automatically vote for life imprisonment sentence?

JUROR #10: Yes.

THE COURT: Does that mean, then, that you would not consider the death penalty?

JUROR #10: No.

THE COURT: In any case?

JUROR #10: No.

THE COURT: Under any circumstances?

JUROR #10: (No response).

THE COURT: Ma'am?

JUROR #10: I said it depends.

THE COURT: I'm sorry.

JUROR #10: I said it depends.

THE COURT: Oh, it depends?

JUROR #10: Yes (nods).

THE COURT: Are there some circumstances, then, where you think you would consider the death penalty?

JUROR #10: Maybe.

THE COURT: Ma'am?

JUROR #10: I said, maybe.

THE COURT: Well, I need to know whether you would or would not.

JUROR #10: Yeah (sic).

THE COURT: Ma'am?

JUROR #10: Yes.

STATE v. CONAWAY

[339 N.C. 487 (1995)]

THE COURT: Thank you, Mrs. Watkins.

. . . .

Q.  Mrs. Watkins, will you be able to follow the law that the Judge instructs you on, he's going to tell you what the law is at the end of the case;

Will you be able to follow that law, even if you would disagree with it?

A.  Juror #10: (No response).

Q.  Let's say, he tells you the law, and you say, "That's the stupidest law I've ever heard of, I don't think that ought to be a law";

It's your duty as a jury [sic] to follow the law as the Judge tells you;

Are you going to be able to do that, put aside your personal belief and follow the law?

A.  Juror #10: No (nods).

. . . .

Q.  Will you be able to follow the law if you disagree with it?

A.  Juror #10: I'll follow the law.

Q.  What?

A.  Juror #10: I said I would follow the law.

Q.  You are going to follow the law?

A.  Juror #10: Yes.

Q.  Even if you disagree with it?

A.  Juror #10: (No response).

Q.  Even if you disagree with it, are you still going to follow it?

A.  Juror #10: No (nods).

Q.  You won't follow it if you disagree with it?

A.  Juror #10: No.

Q.  If he reads you something, and you disagree with it, are you going to just disregard it?

A. Juror #10: What was that?

MR. BRAGG: The State would like to challenge Mrs. Watkins based on cause.

THE COURT: You can have a seat, ma'am, thank you. You may have a seat.

(At this time, Juror Number Ten, Sarah Ann Watkins, left the jury box and resumed her seat in the audience.)

MR. SHARPE: We object.

THE COURT: Okay.

Although defendant objected to prospective juror Watkins' excusal for cause, he made no request to rehabilitate her.

The primary goal of the jury selection process is to ensure selection of a jury comprised only of persons who will render a fair and impartial verdict. *State v. Kennedy*, 320 N.C. 20, 26, 357 S.E.2d 359, 363 (1987). Whether to allow a challenge for cause in jury selection is a decision ordinarily left to the sound discretion of the trial court, and that decision will not usually be reversed on appeal except for abuse of discretion. *State v. Locklear*, 331 N.C. 239, 248, 415 S.E.2d 726, 732 (1992); *Kennedy*, 320 N.C. at 28, 357 S.E.2d at 364. "Nevertheless, in a case . . . in which a juror's answers show that [she] could not follow the law as given . . . by the trial judge in his instructions to the jury, it is error not to excuse such a juror." *State v. Hightower*, 331 N.C. 636, 641, 417 S.E.2d 237, 240 (1992).

The standard for determining when a potential juror may be excluded for cause because of his views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)); *accord State v. Davis*, 325 N.C. 607, 621-22, 386 S.E.2d 418, 425 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990). Prospective jurors with reservations about capital punishment must be able to "state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149 (1986); *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 907-08 (1993). However, a prospective juror's bias or inability to follow the law does not have to be proven with unmistakable clarity. *State v. Locklear*, 331

N.C. at 248, 415 S.E.2d at 731-32; *State v. Davis*, 325 N.C. at 624, 386 S.E.2d at 426. "[T]here will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." *Wainwright v. Witt*, 469 U.S. at 426, 83 L. Ed. 2d at 852-53.

In the instant case, the record shows that when questioned by the prosecutor, prospective juror Watkins gave conflicting answers about her opposition to the death penalty and her ability to set aside her own beliefs and follow the law. The conflicting answers given by prospective juror Watkins left the impression that Watkins would be unable to fairly and impartially follow the law. *Wainwright v. Witt*, 469 U.S. at 426, 83 L. Ed. 2d at 852. Accordingly, the trial court did not err in granting the prosecutor's challenge of prospective juror Watkins for cause.

As defendant failed to make any request to rehabilitate prospective juror Watkins, he has failed to preserve for appellate review his contention that the trial court erred in failing to allow rehabilitation of this prospective juror. *State v. Wiggins*, 334 N.C. 18, 30, 431 S.E.2d 755, 762 (1993). This assignment of error is overruled.

[4] Next, defendant argues that the trial court erred in denying his pretrial motion to prevent the prosecutor from exercising peremptory challenges to remove prospective jurors who were not challengeable for cause but who nevertheless expressed some hesitancy concerning the death penalty. Defendant contends that such use of peremptory challenges by the prosecution resulted in a jury composed exclusively of jurors who favored the death penalty, depriving him of his constitutional right to a trial by a fair and impartial jury composed of a cross section of the community and in violation of his right to be free from cruel and unusual punishment. Defendant relies on *Gray v. Mississippi*, 481 U.S. 648, 95 L. Ed. 2d 622 (1987), to support his argument.

Defendant contends that in *Gray*, a plurality of the United States Supreme Court suggested that review of the use of peremptory challenges by the prosecutor to remove potential jurors not otherwise excludable for cause but who express hesitancy about the death penalty may be required. *Id.* Defendant contends that this reading of *Gray* indicates that the prosecutor's use of peremptory challenges to remove such jurors was unconstitutional.

STATE v. CONAWAY

[339 N.C. 487 (1995)]

This Court has consistently rejected this argument and has interpreted *Gray* as holding that there is no constitutional infirmity with such a use of peremptory challenges by the prosecutor to remove potential jurors who the prosecutor feels would be hesitant to vote to impose the death penalty. *E.g., State v. Jones,* 336 N.C. 229, 443 S.E.2d 48, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 423 (1994), *reh'g denied,* —— U.S. ——, 130 L. Ed. 2d 676, 63 U.S.L.W. 3517 (1995); *State v. Bacon,* 326 N.C. 404, 390 S.E.2d 327 (1990). Defendant has not provided any compelling arguments why we should abandon our prior interpretation of *Gray v. Mississippi*; and we, therefore, decline to do so. We conclude that there was no error in the trial court's denial of defendant's motion.

### GUILT-INNOCENCE PHASE ISSUES

[5] Defendant contends that the trial court committed reversible error by denying his motion to sequester the three codefendants expected to testify against him at trial. Defendant requested that the three codefendants be sequestered during the presentation of the State's evidence based on the importance of their testimony to the State's case against him and a general concern that the witnesses might change their testimony to corroborate one another at trial.

"[A] motion to sequester witnesses is addressed to the discretion of the trial court, and the court's denial of the motion will not be disturbed in the absence of a showing of abuse." *State v. Woods,* 307 N.C. 213, 220, 297 S.E.2d 574, 579 (1982). One of the purposes of sequestering witnesses is to prevent them from tailoring their testimony after that of earlier witnesses. *State v. Pittman,* 332 N.C. 244, 254, 420 S.E.2d 437, 442 (1992).

In this case defendant has failed to show that the trial court abused its discretion by denying his motion to sequester these three witnesses during the presentation of the State's evidence. In his motion defendant gave no reason for suspecting that the State's witnesses would tailor their testimony to accord with the testimony of previous witnesses, other than the general concern that such tailoring was possible because each codefendant had a stake in the outcome of this case. Further, there is nothing in the record to suggest that any of the codefendants were present in the courtroom during the testimony of another codefendant. Defendant has not shown any prejudice from the denial of this motion, and we hold the court's ruling on the motion to be without error.

**[6]** Next, defendant contends that the trial court erroneously denied his request for a jury instruction on second-degree murder. Defendant asserts that there was evidence in the record from which the jury could have reasonably found that although he killed the two victims, he did not do so with premeditation and deliberation and that, therefore, it was reversible error for the court to refuse to instruct the jury on second-degree murder. For the following reasons, we reject defendant's argument.

The test for determining whether the jury must be instructed on second-degree murder is whether there is any evidence in the record which would support a verdict of second-degree murder. *State v. Strickland,* 307 N.C. 274, 285, 298 S.E.2d 645, 653 (1983), *overruled in part on other grounds by State v. Johnson,* 317 N.C. 193, 344 S.E.2d 775 (1986). " 'It is unquestioned that the trial judge must instruct the jury as to a lesser-included offense of the crime charged, when there is evidence from which the jury could find that the defendant committed the lesser offense.' " *State v. Conner,* 335 N.C. 618, 635, 440 S.E.2d 826, 835 (1994) (quoting *State v. Redfern,* 291 N.C. 319, 321, 230 S.E.2d 152, 153 (1976), *overruled in part on other grounds by State v. Collins,* 334 N.C. 54, 431 S.E.2d 188 (1993)). However, if the State's evidence is sufficient to satisfy its burden of proving each element of first-degree murder, including premeditation and deliberation, and there is no evidence other than defendant's denial that he committed the crime to negate these elements, the trial court should not instruct the jury on second-degree murder. *Id.* at 634-35, 440 S.E.2d at 835 (citing *State v. Strickland,* 307 N.C. at 293, 298 S.E.2d at 658).

The United States Supreme Court has indicated that in cases where one or more elements of the offense charged remain in doubt but the defendant is clearly guilty of some offense, the jury is likely to resolve its doubts in favor of a conviction rather than to acquit the defendant altogether. *Beck v. Alabama,* 447 U.S. 625, 634, 65 L. Ed. 2d 392, 401 (1980). In such cases, an instruction on a lesser-included offense must be given to reduce the risk of an unwarranted conviction. *Id.* at 635, 65 L. Ed. 2d at 401. However, due process requires an instruction on a lesser-included offense only "if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Id.*

The evidence in this case supports all the elements of first-degree murder, including premeditation and deliberation. Premeditation requires that the act have been thought out beforehand for some peri-

od of time, no matter how brief. *State v. Conner*, 335 N.C. at 635, 440 S.E.2d at 836; *State v. Myers*, 299 N.C. 671, 677, 263 S.E.2d 768, 772 (1980). Deliberation requires that the defendant have the intent to kill, carried out in a cool state of blood, in furtherance of a fixed design or to accomplish an unlawful purpose, and not under the influence of a violent passion, suddenly aroused by a lawful or just cause or legal provocation. *Conner*, 335 N.C. at 635, 440 S.E.2d at 836; *State v. Hamlet*, 312 N.C. 162, 170, 321 S.E.2d 837, 842-43 (1984). The State's evidence showed that defendant wanted to steal a car to drive to Washington, D.C., the night of 22 August 1991; he kidnapped the victims from the Pantry in Hamlet; he stole Paul Callahan's car and held the victims at gunpoint while driving around Hamlet; he threatened to kill the victims if they turned their heads to look at any of the other occupants of the car or if they lied to him about the condition of the car; he drove the car out on a rural road and stopped in an isolated spot; when he stopped the car, he commented to the other passengers that "[t]his is a good spot right here"; he ordered the victims to get out of the car and follow him into the woods; he forced the victims to get down on their knees and shot one of them in the head while the other begged for his life; he then shot and killed the other victim. This evidence is more than sufficient to support a finding of two unprovoked and calculated murders. Defendant's testimony was that he did not commit the murders. No evidence was presented to support a conviction of second-degree murder. Therefore, the trial court did not err by refusing to instruct the jury on this lesser-included offense.

SENTENDING PROCEEDING ISSUES

In the sentencing proceeding, the State resubmitted all evidence offered during the guilt-innocence phase.

Defendant's evidence included testimony from his cousin, Cynthia McRae, and Dr. Brad Fisher, a psychologist.

Cynthia McRae testified that defendant moved to North Carolina during the summer of 1991 to help her take care of their ailing grandmother. She indicated that defendant helped bathe their grandmother, washed her clothes, went grocery shopping for her, and cleaned her house. She testified that even after he moved to Hamlet to live with his girlfriend, he rode his bicycle to Rockingham to help take care of his grandmother.

**STATE v. CONAWAY**

[339 N.C. 487 (1995)]

Ms. McRae further testified that defendant was conceived when his mother was raped at age thirteen. Defendant's mother remarried when he was approximately one year old. She had other children, and defendant's stepfather treated the other children better than he treated defendant. She testified that defendant's stepfather would get drunk and physically beat defendant and his mother.

Defendant was placed in the custody of the Division of Social Services when he was twelve years old, when his mother decided she did not want her children any longer. Defendant repeatedly ran away from foster homes to be with his mother or his grandmother. When defendant was fourteen years old, he was sentenced to imprisonment in an adult prison for breaking and entering.

Dr. Brad Fisher was accepted by the court as an expert in clinical forensic psychology. He interviewed defendant twice in September 1992. Dr. Fisher also reviewed other psychological and psychiatric diagnoses, DSS records, and information from family members. He testified that defendant was undersocialized and aggressive and that he had major psychological difficulties stemming from his abandonment by his mother when he was a child; but in Dr. Fisher's opinion, defendant was not psychotic nor did he suffer from a major mood or thought disorder. He testified that in the past, defendant had received a variety of diagnoses, including being schizophrenic, probably psychotic, depressed, suicidal, schizoid, and having minimal brain disfunction. In Dr. Fisher's opinion, these varied diagnoses suggested that defendant was subject to tremendous chaos, neglect, abuse, and abandonment as a child, which resulted in a disturbance very difficult to definitively diagnose at an early age.

Dr. Fisher testified that defendant was disturbed and out of control by age fourteen, when he was sent to an adult prison. His time in prison came at a critical time in his development and led to "a different set of learning and problems that continued into [defendant's] adult life." He further testified that the time defendant spent serving his sentence in an adult prison exacerbated defendant's difficulties with expressing his emotions. He testified that he thought defendant's difficulties in expressing his emotions stemmed not only from his early abandonment, but from the need to survive and adapt to life in an adult prison by covering his emotions.

Dr. Fisher testified, based on the reports and records he had seen, that defendant had developed problems with drug and alcohol abuse at an early age. On cross-examination, he testified that he believed

that defendant was beyond the reach of therapeutic help or rehabilitation, based not only on defendant's thirteen years of parental neglect, abandonment, and abuse, but also on the years he spent in an adult prison learning how tough he needed to be to survive there.

The State offered rebuttal evidence consisting of the testimony of Dr. C.W. Lin, a psychiatrist at Dorothea Dix Hospital who was accepted as an expert in psychiatry by the court. Dr. Lin, who works with the Pretrial Evaluation Center, testified that he interviewed defendant in March 1992 and examined defendant's psychological and psychiatric diagnoses, DSS records, and records from the Maryland Department of Corrections. He performed psychological testing on defendant and found him competent to stand trial. He testified that defendant knew the difference between right and wrong and that defendant did not have a significant mood or thought disorder, but manifested impulsive, unpredictable, and potentially assaultive tendencies.

The same three aggravating circumstances were submitted to the jury for each murder: (i) the murder was committed while defendant was engaged in the commission of a kidnapping, N.C.G.S. § 15A-2000(e)(5) (1988); (ii) the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and (iii) the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). The jury found the existence of all three of these aggravating circumstances.

Sixteen mitigating circumstances were submitted to the jury. The three statutory mitigating circumstances submitted to the jury were (i) defendant's lack of a significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); (ii) his incapacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, N.C.G.S. § 15A-2000(f)(6); and (iii) any other circumstance arising from the evidence which one or more jurors found to have mitigating value, N.C.G.S. § 15A-2000(f)(9). The jury declined to find the existence of any of these statutory mitigating circumstances.

The two nonstatutory mitigating circumstances submitted to and found by the jury were that (i) as a result of a number of relatively short-term placements in foster homes, relatives' homes, youth homes, and detention, defendant was deprived of the family nurturing and bonding that is necessary to healthy emotional development; and (ii) defendant was in adult prison from his fourteenth birthday until

his twenty-third birthday, a particularly critical time in a young person's development. The jury declined to find twelve additional nonstatutory mitigating circumstances.

Pursuant to N.C.G.S. § 15A-2000(b)(2), the jury unanimously found for both murders that the mitigating circumstances found were outweighed by the aggravating circumstances found. Further, under N.C.G.S. § 15A-2000(b)(3), when considered with the mitigating circumstances, the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty for both murders. Consequently, the jury recommended that defendant be sentenced to death for both murders.

[7] Defendant first contends that the trial court erred by denying his motion to *voir dire* juror Waddell at the beginning of the sentencing proceeding on whether he was related to Kelly Harrington, one of the codefendants who testified against defendant during the State's case-in-chief. The jury returned a verdict of guilty late in the afternoon on Thursday, 15 October 1992. Court was recessed on 16 October and over the weekend. On 19 October 1992, at the beginning of the sentencing proceeding, defendant's counsel advised the court that on 10 October 1992, his secretary had received an anonymous phone call at the office in which the caller indicated that juror Waddell was a cousin of codefendant Harrington. Defense counsel requested that the trial judge make inquiry of the juror as to his relationship, if any, to Harrington and implied that the juror might not have been entirely honest in his response to questions on *voir dire*. Defense counsel could cite the trial court no authority entitling him to the motion.

Defendant now argues that the denial of his motion to *voir dire* juror Waddell about this alleged relationship was a violation of his constitutional right to trial by a fair and impartial jury. Defendant premises this contention on the importance of Harrington's testimony to the State's case against defendant and the potential that juror Waddell could not have been impartial towards the defendant.

Once a jury has been impaneled, any further challenge to a juror is a matter within the trial court's sound discretion. *State v. Harris*, 323 N.C. 112, 123, 371 S.E.2d 689, 696 (1988). The only evidence that defendant presented in support of his motion was the anonymous telephone call alleging that juror Waddell and Harrington might be cousins. Defendant presented no other evidence to support his suspicions. Further, although defense counsel knew of this alleged telephone call on 10 October 1992, he did not bring it to the attention of

the court until nine days later at the start of the sentencing proceeding after his client had been found guilty of these two first-degree murders. This case was heard on four of the intervening days between the time defense counsel received the phone call and the time he brought it to the court's attention. During this time defendant presented evidence and arguments for the jury's consideration at the guilt-innocence stage of his trial.

Given defendant's critical delay in bringing this alleged telephone call to the trial court's attention and the lack of evidence to substantiate this alleged anonymous telephone call, the trial court did not abuse its discretion in denying defendant's motion to *voir dire* juror Waddell about his possible relationship to Kelly Harrington. This assignment of error is overruled.

[8] Defendant next contends that the trial court erred by denying his motion to argue parole eligibility at his sentencing hearing. Defendant argues that in light of his two first-degree murder convictions, his kidnapping convictions, his robbery with a dangerous weapon conviction, and his misdemeanor larceny conviction, the evidence that he would be virtually ineligible for parole if he received life imprisonment for these murders was a relevant consideration for the jury at sentencing. Defendant argues that a great many jurors have misconceptions about parole eligibility, and in light of these misconceptions, fundamental fairness required that he be permitted to educate the jury regarding parole eligibility. He further argues that in light of the prosecutor's argument that the jury was the conscience of the community, which defendant contends encouraged the jury to give him the death penalty to protect the community, the refusal of the trial court to permit him to argue parole eligibility violated his due process right to rebut the prosecutor's argument. We conclude that the trial court properly denied defendant's motion.

In *California v. Ramos*, 463 U.S. 992, 1013 n.30, 77 L. Ed. 2d 1171, 1188 n.30 (1983), the United States Supreme Court indicated that in situations where a defendant is eligible for parole, states reasonably may conclude that such parole eligibility information should be excluded from consideration by the jury. The Court stated that "States are free to provide greater protections in their criminal justice system than the Federal Constitution requires" and ruled that the decision to permit juries to consider parole eligibility information was best left up to the states. *Id.* at 1013-14, 77 L. Ed. 2d at 1189.

STATE v. CONAWAY

[339 N.C. 487 (1995)]

This Court has consistently held that evidence about parole eligibility is not a relevant consideration during jury selection, closing argument, or jury deliberation in a capital sentencing proceeding because it does not reveal anything about the defendant's character or record or about any circumstance of the offense. *State v. Price,* 337 N.C. 756, 759, 448 S.E.2d 827, 829 (1994); *State v. Payne,* 337 N.C. 505, 516, 448 S.E.2d 93, 99 (1994); *State v. Bacon,* 337 N.C. 66, 98, 446 S.E.2d 542, 558 (1994), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 1083 (1994).

This Court has recently held that the United States Supreme Court decision in *Simmons v. South Carolina,* 512 U.S. ——, 129 L. Ed. 2d 133 (1994), does not affect our prior holdings on this issue. *Simmons* is limited to those situations where the alternative to a sentence of death is life imprisonment without the possibility of parole. *State v. Price,* 337 N.C. at 763, 448 S.E.2d. at 831; *State v. Payne,* 337 N.C. at 516, 448 S.E.2d at 99. In *Simmons v. South Carolina,* the Court ruled that in situations where the defendant is not eligible for parole, the sentencing jury must be informed of that fact if the prosecutor argues future dangerousness as a basis for the imposition of the death penalty. 512 U.S. at ——, 129 L. Ed. 2d at 146. The Court acknowledged its earlier *Ramos* decision and distinguished it from the life-without-possibility-of-parole situation. *Id.* at ——, 129 L. Ed. 2d at 145.

In the instant case, defendant would have been eligible for parole if given a life sentence.[1] Applying the foregoing principles, we hold that evidence concerning his parole eligibility was not required to be presented to the jury and overrule this assignment of error.

[9] In his next assignment of error, defendant alleges that the trial court erred in denying his motion *in limine* to prohibit the State from introducing evidence of the length of any sentences previously received by defendant for crimes committed in other states.

When he was fourteen years of age, defendant was convicted in Maryland of five counts of breaking and entering and two counts of unauthorized use of a motor vehicle. On 1 November 1982, he received a combined sentence of thirty-nine years in prison for those crimes. Defendant was paroled on 25 October 1990. During cross-

---

1. Pursuant to a statutory amendment, North Carolina now has life without parole, N.C.G.S. § 15A-1380.5 (Supp. 1994). For offenses occurring after 1 October 1994, the judge is required to instruct the jury that a sentence of life imprisonment means a sentence of life without parole. N.C.G.S. § 15A-2002 (Supp. 1994).

examination by the State, defendant was asked about these prior convictions and the individual sentence imposed for each one. Defendant contends that from this evidence, the jury would have been able to determine that he only served eight years on his thirty-nine-year sentence and that this cross-examination was an implicit and improper use of parole considerations on the part of the prosecutor.

Defendant asserts that the denial of his motion *in limine* to exclude the evidence of the length of his prior sentences harmed him in two respects. First, the evidence of the length of time he actually served in prison for his prior crimes inaccurately portrayed his potential parole eligibility for these two first-degree murders. Second, taken with the trial court's denial of his motion to present parole eligibility evidence, the admission of this evidence unconstitutionally deprived him of the opportunity to deny or explain some of the evidence used by the prosecution as the basis for the imposition of the death penalty against him. For the following reasons, we reject defendant's argument.

A motion *in limine* is insufficient to preserve for appeal the question of the admissibility of evidence if the defendant fails to further object to that evidence at the time it is offered at trial. *See State v. Wilson*, 289 N.C. 531, 537, 223 S.E.2d 311, 315 (1976); *Beaver v. Hampton*, 106 N.C. App. 172, 176, 416 S.E.2d 8, 11 (1992), *affirmed in part on other grounds and vacated in part on other grounds*, 333 N.C. 455, 427 S.E.2d 317 (1993). A criminal defendant is required to interpose at least a general objection to the evidence at the time it is offered. *State v. Wilson*, 289 N.C. at 537, 223 S.E.2d at 315. Having failed to object when this evidence was offered at trial, defendant must show that the trial court committed plain error by denying his motion *in limine* and by allowing the prosecutor to question defendant about his Maryland convictions and sentences. *State v. Syriani*, 333 N.C. 350, 376, 428 S.E.2d 118, 132, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994).

Defendant relies on *Gardner v. Florida*, 430 U.S. 349, 51 L. Ed. 2d 393 (1977), to support his contention that the admission of this evidence renders his death sentence unconstitutional. In *Gardner* the United States Supreme Court indicated that it is a violation of due process to impose a death sentence based, at least in part, on the basis of information which the defendant has no opportunity to deny

or explain. *Id.* at 362, 51 L. Ed. 2d at 404. In that case the defendant had been sentenced to death by the trial judge, who based his decision in part on the confidential section of a presentence report which was not provided to the defendant and was, therefore, completely irrebuttable by the defendant.

The instant case is distinguishable from *Gardner v. Florida*. In this case the record reflects no evidence that was not known or available to defendant which was relied on by the jury as part of its decision to sentence defendant to death. Defendant chose to testify in his own behalf; therefore, the evidence of defendant's prior convictions and the sentences for those convictions was properly admitted by the trial court for impeachment purposes pursuant to Rule 609(a) of the North Carolina Rules of Evidence. *State v. Lynch*, 334 N.C. 402, 408, 432 S.E.2d 349, 352 (1993). A review of the record discloses that not only was defendant afforded a full opportunity to explain or rebut this impeachment evidence at trial, but that defendant actually addressed this evidence during his own direct examination. Defense counsel specifically questioned defendant about these prior convictions, including questions about defendant's sentences and parole.

Unlike *Gardner*, where the objectionable evidence was completely unknown and unavailable to the defendant, in the instant case defendant himself brought to the attention of the jury the evidence which he now contends was used by the State as an implicit and improper parole argument. During direct examination, defendant informed the jury that he had not served his full sentence in Maryland before he was paroled. In explaining why he ran from the Maryland police officers when they tried to question him, defendant testified that he attempted to avoid arrest because he was in violation of his parole and "had twenty-three years back-up time" left on his Maryland sentence. We find defendant's contention that he was unable to rebut this evidence to be without merit.

Further, no evidence in the instant case suggests that the prosecutor attempted to connect defendant's Maryland sentences to improper parole considerations. The permissible scope of inquiry into a criminal defendant's prior convictions is restricted to the name of the crime, the time and place of the conviction, and the punishment imposed. *State v. Lynch*, 334 N.C at 409, 432 S.E.2d at 352. Although he questioned defendant on cross-examination about the sentences he received for each crime and noted that they added up to thirty-nine years, the prosecutor made no attempt to question defendant about

STATE v. CONAWAY

[339 N.C. 487 (1995)]

how much time he actually served on each sentence before he was paroled or to have defendant testify how much time was left on his combined sentence when he was paroled. Defendant was the only party to inform the jury of the time remaining on his Maryland sentences.

In light of the above, we conclude there was no error, much less plain error, in the trial court's denial of defendant's motion *in limine* to exclude this evidence.

[10] In a related assignment of error, defendant contends that the trial court erred by allowing the prosecutor, over defendant's objections, to implicitly argue parole eligibility concepts during his closing argument to the jury. Defendant concedes that there was no direct discussion of parole eligibility but contends that in his closing argument, the prosecutor implicitly argued parole eligibility for these two murders by reiterating that defendant had been paroled without serving his complete sentence for his prior Maryland convictions. Defendant argues that this argument violated his right to due process pursuant to *Gardner v. Florida*, 430 U.S. 349, 51 L. Ed. 2d 393, because he was prevented from rebutting these parole eligibility concepts.

During his closing argument, the prosecutor stated that:

John Conaway had absconded from the State of Maryland. He was a convicted felon. He came to Richmond County, North Carolina. He took two men—he robbed them, he kidnapped them, and brutally executed them in the woods.

Ladies and gentlemen, this case calls for only one verdict. And that verdict is death.

From the lips of their own expert, Doctor Brad Fisher, ladies and gentlemen, their own expert said, that John Conaway is beyond the reach of therapeutic and rehabilitative process.

What does that mean? It means he can't be helped. He's beyond the help of the resources that they have in prison. They can't help him. Even after spending eight years in prison, and having twenty-two years hanging over his head, if he violated his parole, John Conaway couldn't stop. He chose not to be stopped.

If he receives life in prison, ladies and gentlemen, John Conaway is going to eat, he's going to sleep——

MR. SHARPE: OBJECT to this line of argument, Your Honor.

STATE v. CONAWAY

[339 N.C. 487 (1995)]

While defendant objected to the prosecutor's argument, he did not object to the part of the argument in which the prosecutor made reference to defendant's violation of his Maryland parole. Therefore, this argument is reviewable only to determine whether the prosecutor's argument was so grossly improper that the trial court erred by failing to intervene *ex mero motu* to correct the error. *State v. Sexton*, 336 N.C. 321, 377, 444 S.E.2d 879, 911, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 429 (1994). A prosecutor in a capital trial is entitled to argue all the facts submitted into evidence, as well as any reasonable inferences therefrom. *State v. McCollum*, 334 N.C. 208, 223, 433 S.E.2d 144, 152 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895, *reh'g denied*, —— U.S. ——, 129 L. Ed. 2d 924 (1994).

The prosecutor's reference to the time remaining on defendant's Maryland sentences was based on properly admitted evidence or a reasonable inference therefrom and did not infect the trial with prejudice in violation of defendant's due process rights. This was a direct reference to defendant's own testimony during direct examination; and, as we noted above, defendant had a full opportunity at trial to explain or rebut this evidence.

Viewed in its entire context, the prosecutor's argument was not directed toward defendant's eventual parole if defendant was not given the death penalty. The prosecutor referred to defendant's Maryland parole as a part of his argument that a life sentence would not be an effective sentence in this case since defendant could not be helped by the therapeutic or rehabilitative processes available to him in prison according to the testimony of defendant's own expert witness. The prosecutor was emphasizing to the jury that defendant continued to engage in criminal activity, despite the time he had served in prison and the threat of returning to prison for an additional twenty-three years if he committed further criminal activity in violation of his parole. We reject defendant's contention that this was an implicit argument that if defendant was not given the death penalty for these two murders, he would eventually be eligible for parole.

Further, we note that this argument was not based on the future dangerousness of defendant but on the ineffectiveness of a prison sentence as a punishment for this defendant. As we noted above, since defendant would have been eligible for parole and the prosecutor made no argument about his future dangerousness, defendant was not entitled to present parole eligibility evidence under *Simmons v. South Carolina*, 512 U.S. ——, 129 L. Ed. 2d 133. Since there was no

error in the prosecutor's reference to defendant's violation of his Maryland parole, the trial court did not err in failing to intervene *ex mero motu*; and this assignment of error is overruled.

[11] Defendant next contends that the prosecutor made several other improper closing arguments at sentencing, entitling him to a new sentencing hearing. We address each of his contentions in order and find them all to be without merit.

First, defendant argues that the trial court erred in allowing the prosecutor, over defendant's objections, to show the jury photographs of the victims' partially decomposed bodies. Defendant claims that although these photographs may have been properly admitted during the guilt-innocence phase of his trial, the use of these photographs was irrelevant to the issues to be decided at sentencing.

A review of the transcript does not support defendant's contention that photographs depicting the partially decomposed bodies of the victims were shown to the jury during the prosecutor's closing argument. The record reflects only that pictures of the victims while living were shown to the jury during this argument. Assuming *arguendo* that photographs depicting the partially decomposed bodies were actually shown to the jury during the prosecutor's closing argument, we still do not find this to be error on the facts of this case.

All of the evidence properly admitted during the guilt determination stage of a capital trial is competent for consideration by the jury at sentencing, as long as the court determines it has probative value. N.C.G.S. § 15A-2000(a)(3). Photographs which depict the circumstances of the murder, the condition of the body, or the location of the body when found are relevant and admissible at sentencing, even when the victim's identity and the cause of death are not in dispute at trial. *State v. Lee*, 335 N.C. 244, 279, 439 S.E.2d 547, 565, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 162, *reh'g denied*, —— U.S. ——, 130 L. Ed. 2d 532 (1994). This is true even if the photographs are gory or gruesome. *State v. Rose*, 335 N.C. 301, 319, 439 S.E.2d 518, 528, *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 883 (1994).

Such properly admitted photographs may be used by the prosecutor during his closing argument to argue any reasonable inferences which may be drawn from the evidence to enable the jury to reach a proper sentencing recommendation. *State v. McCollum*, 334 N.C. 208, 224, 433 S.E.2d 144, 152. Further, defendant is entitled to a new sen-

tencing hearing only if the prosecution's argument exceeds the scope of the evidence and " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Id.* (quoting *Darden v. Wainwright,* 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986)).

While defendant has not identified which photographs depicting the victims' partially decomposed bodies were shown to the jury, a review of the transcript discloses that two photographs of each victim were used during the testimony of Dr. Butts during the guilt-innocence phase to illustrate his testimony about the autopsies of the victims and the gunshot wounds to their heads.

Based on the foregoing principles, the photographs allegedly depicting the partially decomposed bodies of the victims were admissible at this sentencing hearing. The photographs depicted for the jury the manner in which the two victims were shot and the precise location of the gunshot wounds. These photographs depicting the circumstances of the victims' deaths, including that their bodies were left to decompose and to be subjected to the ravages of the elements, were relevant to the issues to be determined during the sentencing proceeding. *See State v. Lee,* 335 N.C. at 279, 439 S.E.2d at 564.

[12] Next, defendant contends that the trial court erred allowing the prosecutor to argue, over defendant's objections, that the jurors should remember the condition of the victims' bodies when they were removed from the woods seven days after the murders. At the time the prosecutor made this argument, defendant contends, the prosecution was showing the jury photographs of the victims' bodies after seven days of decomposition. Relying on *State v. Johnson,* 298 N.C. 355, 259 S.E.2d 752, defendant claims that the partially decomposed condition of the victims' bodies when they were found had no bearing on any material issues at sentencing and was an improper argument.

As noted above, the record does not support defendant's contention that photographs depicting the partially decomposed bodies of the victims were ever shown to the jury during the sentencing proceeding. Assuming *arguendo* that they were shown to the jury, the photographs depicting the partially decomposed condition of the victims' bodies when found and the nature and location of the victims' gunshot wounds were properly admitted into evidence and were, therefore, competent for consideration by the jury at sentencing. N.C.G.S. § 15A-2000(a)(3). Viewed in the context of his entire argu-

ment, the prosecutor's alleged use of the photographs and his reference to the condition of the victims' bodies when they were removed from the woods seven days after the murders did not exceed the scope of the evidence and were not improper. *State v. McCollum*, 334 N.C. at 224, 433 S.E.2d at 152. The reference was made as a part of his argument to the jury that the victims were unique individuals whose deaths represented a unique loss to their families. *Payne v. Tennessee*, 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735 (1991). This reference emphasized to the jury that the victims were now dead and that defendant was the person responsible for their deaths. In *Payne*, the United States Supreme Court upheld such victim impact arguments unless the victim impact evidence was so prejudicial that it rendered the trial fundamentally unfair. *Id.*

Defendant further contends that in light of the expressed concern of several prospective jurors about viewing gruesome photographs, the use of the photographs depicting the partially decomposed bodies of the victims was excessive and designed to inflame the passions of the jury. A new sentencing hearing may be warranted when an excessive number of photographs depicting the same scene and having no additional probative value is used solely to inflame the jury. *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988). However, defendant has made no showing that the alleged use of these four photographs, two of each victim's body, was excessive or repetitive, other than the bare claim that some jurors might have been upset by the gruesome pictures of the victims' bodies. In light of the probative nature of the photographs, we reject this argument. In the instant case, the prosecutor's argument was not so prejudicial as to render defendant's trial fundamentally unfair, and we find no error on the part of the trial court in overruling defendant's objection.

**[13]** Next, defendant contends that the trial court erred in overruling his objection to the prosecutor's argument that after defendant shot and killed the first victim, the second man begged defendant for his life. A review of the record reveals, however, that this argument did not exceed the scope of the evidence admitted at trial. Two witnesses, Kevin Scott and Michael McKinnon, testified at trial that when defendant returned to the car after the murders, he told them that he made the victims get down on their knees and that after he shot the first victim, the other begged defendant for his life. We find the prosecutor's statement to have been within the permissible scope of jury argument during a capital sentencing procedure. Hence, the trial court did not err in overruling defendant's objection.

**[14]** Defendant next contends that the trial court erred in overruling his objections to the prosecutor's argument that the jury should consider the victims' last thoughts before death. Defendant claims this argument was calculated to inflame the passions and prejudices of the jury, in violation of his state and federal constitutional rights to be free from cruel and unusual punishment.

However, viewed in the context of his entire argument, this argument constitutes the same type of victim impact argument approved by the United States Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720. The prosecutor was attempting to inform the jury of the unique losses suffered by the parents and siblings of the victims, and especially by Amos Weatherford's three-year-old son, as a result of defendant's actions. This type of victim impact argument enables the jury to assess meaningfully defendant's moral culpability and blameworthiness. *Id.* at 825, 115 L. Ed. 2d at 735.

As noted above, this type of argument is permissible unless the evidence is so prejudicial that it renders the trial fundamentally unfair. *Id.* The prosecutor made no attempt to credit the victims with any particular thoughts. This argument merely served to remind the jury that the victims were sentient beings with close family ties before they were murdered by defendant. This argument was supported by the facts in evidence or reasonable inferences therefrom and was not so prejudicial as to render defendant's trial fundamentally unfair. The trial court did not err in overruling defendant's objection.

**[15]** Finally, defendant cites to a short passage taken from the prosecutor's closing argument in which the prosecutor stated:

> You twelve jurors are the collective conscience of this community. You must come together, and by your verdict tell the citizens of this county, the citizens of this state, and even the citizens of this nation, that the premeditated and deliberate first degree murder of Amos Weatherford and Paul Callahan—that those murders are going to be punished by death.

Defendant claims that this argument blatantly encouraged the jury to sentence defendant to death to deter other crimes, to ignore the evidence, and to yield to the public's demand for punishment. As defendant failed to object at trial, our review is limited to determining whether the remarks were so grossly improper as to require the trial court to intervene *ex mero motu*. *State v. Sexton*, 336 N.C. 321, 377, 444 S.E.2d 879, 911.

Prosecutorial comments reminding the jury that it is acting as the voice and conscience of the community are permissible. *State v. McCollum*, 334 N.C. at 226, 433 S.E.2d at 153; *State v. Soyars*, 332 N.C. 47, 61, 418 S.E.2d 480, 488 (1992). Arguments that emphasize the public sentiment about a particular crime and demand that the jury convict and punish the defendant in compliance with this public sentiment are impermissible. *State v. Scott*, 314 N.C. 309, 312, 333 S.E.2d 296, 298 (1985). Arguments that encourage the jury to convict a defendant as a general deterrence to this type of crime are also impermissible. *State v. Kirkley*, 308 N.C. 196, 215, 302 S.E.2d 144, 155 (1983), *overruled in part on other grounds by State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988). However, in so holding, this Court specifically noted that such arguments are not so grossly improper as to require the trial court to intervene *ex mero motu* to correct this error. *Id.* Further, prosecutorial arguments for death based on the deterrent effect on this particular defendant are permissible. *State v. Gibbs*, 335 N.C. 1, 69, 436 S.E.2d 321, 360 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 881 (1994); *State v. Johnson*, 298 N.C. 355, 367, 259 S.E.2d 752, 760.

Viewed in light of the foregoing principles, the prosecutor's comment informing the jury that it was the voice and conscience of the community was permissible. This argument encouraged the jury to sentence defendant to death without improperly demanding such action on the basis of the community's desires for a conviction. Nor did this argument encourage the jury to sentence defendant to death as a general deterrent to first-degree murder. Even if the prosecutor's comments could have been interpreted as a general deterrence argument, such error was not so grossly improper as to require the trial court to intervene *ex mero motu* to correct it. This assignment of error is overruled.

[16] Next, defendant argues that the trial court erred in instructing the jury on the "course of conduct" aggravating circumstance. Three aggravating circumstances were submitted to the jury for each murder: (i) was the murder committed while defendant was engaged in the commission of a kidnapping, N.C.G.S. § 15A-2000(e)(5); (ii) was the murder committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and (iii) was the murder a part of a course of conduct which included the commission of other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11). Defendant argues that for each murder, the evidence supporting the course of conduct aggravator was duplicative of evidence supporting the kidnapping aggravating cir-

STATE v. CONAWAY

[339 N.C. 487 (1995)]

cumstance and the pecuniary gain aggravating circumstance. Defendant also contends that the trial court's instruction on the "course of conduct" aggravating circumstance failed to inform the jury that it could not use the same evidence to find more than one aggravating circumstance. We reject defendant's arguments.

In *State v. Quesinberry*, 319 N.C. 228, 239, 354 S.E.2d 446, 452 (1987), this Court held that it is error for the trial court to submit multiple aggravating circumstances supported by the same evidence in a capital case. The submission of more than one aggravating circumstance supported by the same evidence "amount[s] to an unnecessary duplication of the circumstances enumerated in the statute, resulting in an automatic cumulation of aggravating circumstances against the defendant." *State v. Goodman*, 298 N.C. 1, 29, 257 S.E.2d 569, 587 (1979). However, where there is separate substantial evidence to support each aggravating circumstance, it is not improper for each aggravating circumstance to be submitted even though the evidence supporting each may overlap. *State v. Jennings*, 333 N.C. 579, 627-28, 430 S.E.2d 188, 213-14, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 602 (1993).

The trial court's submission of N.C.G.S. § 15A-2000(e)(5), (e)(6), and (e)(11) aggravating circumstances for each murder in the instant case did not violate *Quesinberry* because there was substantial separate evidence supporting each of these aggravating circumstances. The (e)(5) circumstance was based on the evidence that each murder was committed during the commission of the kidnapping of the victims. The (e)(6) circumstance was based on the evidence that defendant robbed the store, taking $78.00 from the cash register, and that he stole Paul Callahan's automobile. The (e)(11) circumstance was based on the evidence that defendant killed two victims. Evidence that a defendant killed more than one victim is sufficient to support the submission of the course of conduct aggravating circumstance. *See State v. Jones*, 327 N.C. 439, 452, 396 S.E.2d 309, 316-17 (1990). Therefore, there was no error in submitting each of these aggravating circumstances for the jury's consideration.

[17] This Court has held that the trial court should instruct the jury that it cannot use the same evidence as a basis for finding more than one aggravating circumstance. *State v. Jennings*, 333 N.C. at 628, 430 S.E.2d at 214. However, while the trial court should have so instructed the jury in this case, defendant failed to object to its failure to do so at trial, and therefore plain error analysis applies. *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193.

We find the trial court's failure to instruct the jury that it could not use the same evidence to support more than one aggravating circumstance does not rise to the level of plain error. In light of the substantial separate evidence supporting each aggravating circumstance, it is improbable that the jury would have reached a different result in finding the aggravating circumstances had the trial court not failed to so instruct. *State v. Jennings*, 333 N.C. at 628, 430 S.E.2d at 215. Therefore, we overrule this assignment of error.

**[18]** We note that in connection with the submission of the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that these murders occurred during the commission of the kidnapping of the victims, defendant argues that the prosecutor's refusal to request an instruction on felony murder in the guilt-innocence phase of the trial violated the spirit of this Court's holding in *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980). In *State v. Cherry*, this Court recognized that the submission of aggravating circumstances based on the underlying felony in a felony-murder trial is unconstitutional since otherwise a defendant convicted of felony murder would automatically have one aggravating circumstance pending against him at sentencing; whereas, a defendant convicted of premeditated and deliberate murder would enter the sentencing proceeding with no aggravating circumstances pending against him. *Id.* at 113, 275 S.E.2d at 568.

Defendant argues that by submitting kidnapping and robbery to the jury as separate crimes and then refusing to have the jury instructed on the charge of felony murder, the prosecutor was able to use these underlying felonies as aggravating circumstances against defendant at sentencing when they otherwise would have been subsumed by the felony-murder charge.

Although defendant failed to preserve this claim on appeal by failing to raise it in an assignment of error, we address this argument only to make clear that the prosecutor's actions were in full compliance with the law of North Carolina. *State v. Cherry* prohibits the submission of the underlying felony as an aggravating circumstance only when defendant is convicted solely of felony murder. *Id.* If defendant had been charged and convicted of both premeditated and deliberate murder and felony murder, the underlying felony of kidnapping would properly have been submitted as an aggravating circumstance. *State v. Sexton*, 336 N.C. 321, 377, 444 S.E.2d 879, 911; *State v. McNeil*, 324 N.C. 33, 57, 375 S.E.2d 909, 923 (1989), *sentence*

STATE v. CONAWAY

[339 N.C. 487 (1995)]

*vacated on other grounds,* 494 U.S. 1050, 108 L. Ed. 2d 756, *on remand,* 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied,* 499 U.S. 942, 113 L. Ed. 2d 459 (1991). We conclude defendant's argument is without merit.

**[19]** By his next assignment of error, defendant contends that the trial court's instruction on the capital sentencing procedure unconstitutionally made the consideration of mitigating evidence discretionary with the jury during sentencing. Defendant further contends that the trial court's instruction erroneously defined "mitigating circumstances" thereby unconstitutionally limiting the mitigating evidence the jury could consider. For the following reasons, we reject defendant's contentions.

The trial court charged the jury in accordance with the North Carolina Pattern Jury Instructions on the consideration of mitigating evidence in capital sentencing. In connection with Issue Three, the court instructed the jury that if it found one or more mitigating circumstances, it must weigh the aggravating circumstances against the mitigating circumstances. The court then charged, "Now, when deciding this Issue, each juror may consider any mitigating circumstance or circumstances that the juror determines to exist by a preponderance of the evidence in Issue Two."

In the instructions on Issue Four, the court charged the jury that if it found the aggravating circumstances to outweigh the mitigating circumstances, it must also consider whether the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty. The trial court instructed the jury that in making this determination, it must consider the aggravating circumstances in connection with any mitigating circumstance found by one or more of the jurors. The court then charged, "When making this comparison, each juror may consider any mitigating circumstance, or circumstances[,] that juror determines to exist by a preponderance of the evidence."

Defendant contends that the use of the word "may" in these instructions indicated to the jury that it need not consider mitigating circumstances at all in making these determinations. This Court has repeatedly rejected virtually identical challenges to this instruction for the consideration of mitigating evidence in Issue Three and Issue Four. In *State v. Lee,* 335 N.C. 244, 286-87, 439 S.E.2d 547, 569-70, this Court held that the Pattern Jury Instruction does not make consideration of mitigating evidence discretionary with the jurors. We indi-

cated that this instruction unambiguously instructs the jury that it must weigh the mitigating circumstances against the aggravating circumstances and that the next sentence, in which the word "may" is used, merely "describes which mitigating circumstances are to be considered by the jurors in this weighing process." *Id.* at 287, 439 S.E.2d at 569. "The word 'may' indicates that each juror is allowed to consider those mitigating circumstances that he or she may have found to exist by a preponderance of the evidence." *Id.; see also State v. Jones,* 336 N.C. 229, 259, 443 S.E.2d 48, 63 (language of similar instruction permits jurors to consider all mitigating circumstances).

[20] Further, in connection with this assignment of error, defendant contends that the trial court erroneously defined the concept of a "mitigating circumstance" in its instructions to the jury. The trial court defined a "mitigating circumstance" as follows:

> [A] mitigating circumstance is a fact, or a group of facts which do not constitute a justification or excuse for a killing, or reduce it to a lesser degree of crime than first degree murder, but which may be considered as extenuating, or reduces the moral culpability of the killing, and makes it less deserving of extreme punishment than other first degree murders.

Defendant claims that this charge unfairly restricted the jury from considering the full range of defendant's character and background, as well as the totality of the circumstances surrounding the killings, as a basis for giving him a sentence less than death.

A review of the record discloses that after the above instruction was given, the jury was further instructed that

> our law identifies several possible mitigating circumstances. However, in considering Issue Two, it would be your duty to consider as a mitigating circumstance, any aspect of the defendant's character or record, and any of the circumstances of this murder that the defendant contends is a basis for a sentence less than death. And, any other circumstances arising from the evidence, which you deem to have mitigating value.

Further, the jury was later instructed that it should consider not only all the mitigating circumstances listed on the verdict form but also "any others which you deem to have mitigating value."

In *State v. Robinson,* 336 N.C. 78, 443 S.E.2d 306, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 650 (1994), this Court rejected a similar chal-

lenge to this same definition of "mitigating." In that case, the jury was given virtually the same definition of a "mitigating circumstance" and was also further instructed to consider any aspect of the defendant's character and record and any circumstances of the murder which the defendant contended was a basis for a sentence less than death when determining mitigating circumstances. *Id.* at 122, 443 S.E.2d at 327. That jury was also further instructed to consider not only the statutory mitigating circumstances, but any others which it deemed to have mitigating value. *Id.* In *Robinson*, this Court held that "the instructions as given, which are virtually identical to the North Carolina Pattern Jury Instructions, are a correct statement of the law of mitigation." *Id.* at 122, 443 S.E.2d at 328; *see also State v. Artis*, 325 N.C. 278, 326, 384 S.E.2d 470, 497 (1989) (holding that the North Carolina Pattern Jury Instructions are a correct statement of the law of mitigation), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991).

We conclude that the instructions given in the instant case did not preclude the jury from considering any aspect of defendant's character or background or any of the circumstances of the killing, which defendant may have presented as a basis for the imposition of a sentence less than death. This assignment of error is overruled.

[21] Defendant next contends that the trial court erred in refusing to submit the nonstatutory mitigating circumstance that defendant was conceived when his mother was raped at age thirteen. In order for defendant to succeed on his claim that the trial court erred by refusing to submit his proffered nonstatutory mitigating circumstance, he must show that:

> (1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2) there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury. Upon such showing by the defendant, the failure by the trial judge to submit such nonstatutory mitigating circumstance to the jury for its determination raises federal constitutional issues.

*State v. Benson*, 323 N.C. 318, 325, 372 S.E.2d 517, 521 (1988); *see State v. Green*, 336 N.C. 142, 182, 443 S.E.2d 14, 37-38, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994).

The jury found two nonstatutory mitigating circumstances: (i) that as the result of his repeated placement in foster care, relatives' homes, group homes, and detention, defendant had been deprived of the family nurturing and bonding necessary for healthy emotional development; and (ii) that defendant was in an adult prison between the ages of fourteen and twenty-three, a particularly critical time in a young person's time of development. Defendant argues that the jury could reasonably have found the fact that he was conceived when his mother was raped at age thirteen to have mitigating value and that there was sufficient evidence in the record to require that this circumstance be submitted to the jury for its consideration. He argues that the evidence that he was conceived when his mother was raped was consistent with the two nonstatutory mitigating circumstances found by the jury and should have been submitted to the jury. We find defendant's argument to be without merit.

This Court has previously approved the definition of a mitigating circumstance as "a fact or group of facts, which . . . may be considered as extenuating or reducing the moral culpability of the killing or making it less deserving of extreme punishment than other first degree murders." *State v. Lee*, 335 N.C. 244, 288-89, 439 S.E.2d 547, 570-71; *see State v. Hutchins*, 303 N.C. 321, 279 S.E.2d 788 (1981). In the instant case, the trial court properly concluded that the fact that defendant was conceived through a rape has no logical relationship to his moral culpability for these murders. The trial court based its decision not to submit this nonstatutory mitigating circumstance, at least in part, on the fact that there was no evidence that defendant even knew of the circumstances of his conception prior to the murders. In light of the above, defendant has not established that the jury could reasonably have concluded that this evidence had mitigating value. This assignment of error is overruled.

PRESERVATION ISSUES

[22]   Defendant raises three additional issues which he concedes have been decided against him by this Court. In the first of these issues, defendant contends that the trial court erred in denying his pretrial motion for individual *voir dire* and sequestration of prospective jurors. Defendant recognizes that this Court has consistently denied relief on this basis. *See, e.g., State v. Skipper*, 337 N.C. 1, 57, 446 S.E.2d 252, 283 (1994); *State v. Robinson*, 336 N.C. 78, 131, 443 S.E.2d 306, 333; *State v. Reese*, 319 N.C. 110, 119, 353 S.E.2d 352, 357 (1987); *State v. Wilson*, 313 N.C. 516, 524, 330 S.E.2d 450, 457 (1985);

*State v. Johnson*, 298 N.C. 355, 362, 259 S.E.2d 752, 757. After careful consideration, we decline to depart from our prior holdings on this issue and overrule this assignment of error.

[23] In the next of these assignments of error, defendant contends that the trial court erred in denying his motion to *voir dire* prospective jurors about their misconceptions concerning parole eligibility for a sentence of life imprisonment. Defendant recognizes that this Court has consistently rejected this argument. *See, e.g., State v. Lee*, 335 N.C. 244, 268, 439 S.E.2d 547, 559; *State v. Syriani*, 333 N.C. 350, 399, 428 S.E.2d 118, 145. As we indicated above, the subject of parole eligibility is not relevant to the issues in a capital sentencing proceeding because it does not reveal anything about the defendant's character or record or about any circumstances of the crime. *State v. Payne*, 337 N.C. 505, 516, 448 S.E.2d 93, 99. The trial court did not abuse its discretion by denying defendant's motion.

[24] In the last of these assignments of error, defendant contends that the trial court erred in denying his motion to strike the death penalty on the grounds that the North Carolina death penalty statute and, therefore, defendant's death sentence are unconstitutional. Defendant asserts that the death penalty as administered in North Carolina, and on its face, constitutes cruel and unusual punishment; violates defendant's rights to due process and equal protection; is arbitrary, capricious, and discriminatory; involves subjective discretion on the part of the jury; and in appellate review and otherwise violates fundamental constitutional rights.

Defendant recognizes that this Court has consistently upheld the constitutionality of the North Carolina death penalty statute. *See, e.g., State v. Jones*, 336 N.C. 229, 261, 443 S.E.2d 48, 64; *State v. McHone*, 334 N.C. 627, 644, 435 S.E.2d 296, 306 (1993), *cert. denied,* —— U.S. ——, 128 L. Ed. 2d 220 (1994); *State v. Roper*, 328 N.C. 337, 370, 402 S.E.2d 600, 619, *cert. denied,* 502 U.S. 902, 116 L. Ed. 2d 232 (1991). After careful consideration of this issue, we decline to depart from our previous holdings and overrule this assignment of error.

PROPORTIONALITY

[25] Having found defendant's trial and capital sentencing procedure to be free of prejudicial error, we are required by statute to review the record and determine (i) whether the record supports the jury's finding of the aggravating circumstances upon which the court based its sentence of death; (ii) whether the sentence was imposed under the

influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2); *State v. McCollum,* 334 N.C. 208, 239, 433 S.E.2d 144, 161.

The existence of the following three aggravating circumstances was found by the jury for each murder: (i) that the murder was committed while defendant was engaged in the commission of kidnapping, N.C.G.S. § 15A-2000(e)(5); (ii) that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and (iii) that the murder was a part of a course of conduct in which defendant engaged which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

We have conducted a thorough review of the transcript, record on appeal, and briefs and oral arguments of counsel; and we conclude that the jury's finding of each of these aggravating circumstances was supported by the evidence. We also conclude that nothing in the record suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we consider whether the imposition of the death penalty in this case is proportionate to other cases in which we have affirmed the death penalty, considering both the crime and the defendant. *State v. Robinson,* 336 N.C. 78, 133, 443 S.E.2d 306, 334; *State v. Brown,* 315 N.C. 40, 70, 337 S.E.2d 808, 829. The purpose of conducting proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164, 362 S.E.2d 513, 537, *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also serves "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied,* 448 U.S. 918, 65 L. Ed. 2d 1181 (1980).

We compare this case to similar cases within a pool consisting of

"*all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time."

*State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146 (quoting *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983)). Only cases found to be free from error in both the guilt-innocence and sentencing phases are considered in conducting this review. *State v. Goodman*, 298 N.C. 1, 35, 257 S.E.2d 569, 591.

In *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542, this Court clarified the composition of the pool so as to account for post-conviction relief awarded to death-sentenced defendants:

> Because the "proportionality pool" is limited to cases involving first-degree murder convictions, a post-conviction proceeding which holds that the State may not prosecute the defendant for first-degree murder or results in a retrial at which the defendant is acquitted or found guilty of a lesser included offense results in the removal of that case from the "pool." When a post-conviction proceeding results in a new capital trial or sentencing proceeding, which, in turn, results in a life sentence for a "death-eligible" defendant, the case is treated as a "life" case for purposes of proportionality review. The case of a defendant sentenced to life imprisonment at a resentencing proceeding ordered in a post-conviction proceeding is similarly treated. Finally, the case of a defendant who is either convicted of first-degree murder and sentenced to death at a new trial or sentenced to death in a resentencing proceeding ordered in a post-conviction proceeding, which sentence is subsequently affirmed by this Court, is treated as a "death affirmed" case.

*Id.* at 107, 446 S.E.2d at 564. "[A] conviction and death sentence affirmed on direct appeal is presumed to be without error, and . . . a post-conviction decision granting relief to a convicted first-degree murderer is not final until the State has exhausted all available appellate remedies." *Id.* at 107 n.6, 446 S.E.2d at 564 n.6.

Our consideration on proportionality review is limited to cases roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *State v. Syriani*, 333 N.C. at 400, 428 S.E.2d at 146. If our review of similar cases reveals that juries have consistently returned death sentences in those other cases, a strong basis exists for concluding that the death sentence in the instant case is not excessive or disproportionate. *Id.* at 401, 428 S.E.2d at 146. However, if juries have consistently returned life sentences in these similar cases, a strong basis exists for concluding that

the death sentence in the instant case is excessive or disproportionate. *Id.*

Characteristics distinguishing the instant case include (i) a calculated murder of two victims committed while defendant was engaged in the commission of another felony in order to eliminate witnesses to his earlier crime of robbery; (ii) fear on the part of the victims, who were kidnapped and held at gunpoint; (iii) a cold-blooded killing of the second victim, who was on his knees and begging defendant to spare his life after defendant shot the first victim in the back of the head; and (iv) defendant's failure to show any remorse for these two murders.

Defendant was convicted of both first-degree murders on the theory of premeditation and deliberation. He was also convicted of two counts of first-degree kidnapping, one count of robbery with a firearm, and one count of misdemeanor larceny. For each murder, the jury found each of the three submitted aggravating circumstances: (i) that the murder was committed while defendant was engaged in the commission of a kidnapping, (ii) that the murder was committed for pecuniary gain, and (iii) that the murder was part of a course of conduct in which defendant engaged which included other crimes of violence against another person.

Of the sixteen mitigating circumstances submitted, the jury found two, neither of which was a statutory mitigating circumstance. The mitigating circumstances found related to defendant's (i) repeated placements in foster homes, relatives' homes, youth homes, and detention which deprived him of family nurturing necessary to healthy emotional development and (ii) incarceration in an adult prison from age fourteen until twenty-three, a particularly critical time in a young person's development. The jury declined to find that defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired. N.C.G.S. § 15A-2000(f)(6).

We first compare the instant case to those cases in which this Court has determined the sentence of death to be disproportionate. We note that this Court has determined the death sentence to be disproportionate on seven occasions. *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311

N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

Of the cases where this Court has found the death penalty disproportionate, in only two did the jury find the existence of the course of conduct aggravating circumstance. *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713; *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170. We find that the instant case is further distinguishable from both *Bondurant* and *Rogers*.

In *Bondurant*, this Court found it significant that the defendant did not murder the victim in the perpetration of another felony. He did not coldly calculate the commission of the crime for a long period, but inexplicably shot his friend in the head with a pistol while drinking. He immediately showed concern for the victim's life and remorse for his actions by helping the victim receive medical treatment and by speaking with police officers about the incident. *Bondurant*, 309 N.C. at 693, 309 S.E.2d at 182.

In *Rogers*, the only aggravating circumstance submitted to the jury was the course of conduct aggravator. The defendant's course of conduct did not involve a second murder. In holding the death penalty disproportionate in that case, this Court found it significant that the murder in that case did not display the viciousness and cruelty present in the death-affirmed cases where the course of conduct aggravator was the sole aggravating circumstance found by the jury. *Rogers*, 316 N.C. at 236, 341 S.E.2d at 732.

In the instant case, defendant deliberately set out to steal a car. He looked around the streets of Hamlet for a suitable target. He intentionally robbed the Pantry and kidnapped the two victims at gunpoint. He stole a car from one of the victims and used it to drive the victims to an isolated spot outside Hamlet. He ordered the two victims to get out of the car and follow him into the woods, where he forced them to get down on their knees. He deliberately shot both victims in the back of the head at close range. After he shot the first victim, the second victim begged defendant for his life before being killed.

The record is devoid of any evidence suggesting that defendant showed any concern for the lives of his victims or any remorse for his actions. He did not seek any medical attention for his victims or cooperate with the authorities. The evidence showed that defendant fled

the state after the murders and continually denied his participation in these crimes after his arrest.

The evidence further showed that defendant committed these murders in the perpetration of two other felonies, first-degree kidnapping and armed robbery. These murders were coldly calculated and planned to eliminate any witnesses to his crimes. We find that neither *Bondurant* nor *Rogers* supports a finding of disproportionality in the instant case.

Further, we find no significant similarity between the instant case and any of the other five cases in which we have held the death penalty to be disproportionate. We note that none of the cases in which the death penalty has been held disproportionate involved the murder of more than one victim. In the instant case, defendant was convicted of two first-degree murders.

In only one case, *State v. Young*, 312 N.C. 669, 325 S.E.2d 181, were multiple aggravating circumstances found to exist. *State v. Gibbs*, 335 N.C. at 73, 436 S.E.2d at 363. In finding the death penalty to be disproportionate in *Young*, this Court focused on the jury's failure to find either the "especially heinous, atrocious or cruel" aggravating circumstance, N.C.G.S. § 15A-2000(e)(9), or the "course of conduct" aggravating circumstance, N.C.G.S. § 15A-2000(e)(11). *Id.* (citing *State v. McCollum*, 334 N.C. 208, 241, 433 S.E.2d 144, 162). The course of conduct aggravating circumstance was one of the three aggravating circumstances found by the jury in the instant case.

Further in support of his contention that his death sentence is disproportionate, defendant argues that the majority of robbery-murder cases have resulted in sentences of life imprisonment. However, this Court has long rejected any mechanical or empirical approach to the comparison of cases that are superficially similar. *State v. Robinson*, 336 N.C. at 139, 443 S.E.2d at 337. In analyzing whether the death penalty in this case is proportionate to other death-affirmed cases, our attention is focused on an " 'independent consideration of the individual defendant and the nature of the crime or crimes which he has committed.' " *Id.* (quoting *State v. Pinch*, 306 N.C. 1, 36, 292 S.E.2d 203, 229, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled in part on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517).

STATE v. CONAWAY

[339 N.C. 487 (1995)]

There are several similar cases in the pool in which the jury has recommended a sentence of death for robbery-murders. One such case is *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983). In *Williams*, the defendant robbed a gas station in the middle of the night. He shot the clerk in the back of the head at close range with a shotgun and left him in a puddle of blood on the floor with part of his head blown away. *Id.* at 661, 292 S.E.2d at 248. The victim did not die immediately, but lay on the floor coughing and gagging. *Id.* The jury found as the single aggravating circumstance that the murder was committed as part of a course of conduct involving the commission by the defendant of another crime of violence against another person. *Id.* at 662, 292 S.E.2d at 249. This aggravating circumstance was based on the evidence that after the defendant shot the first clerk, he proceeded to rob a convenience store, fatally shooting another clerk. *Id.*[2]

In affirming the death penalty in *Williams*, this Court remarked on the brutality of the killings and noted that the defendant had intentionally robbed two lone employees of business establishments located in relatively isolated areas, in the middle of the night, and then with no provocation shot them to death at close range before fleeing with the money. *Id.* at 690, 292 S.E.2d at 263.

The murders at issue in the instant case are even more brutal and callous than the murder in *Williams*. In this case and in *Williams*, the defendant shot the victims for the purpose of eliminating the witnesses to his crimes. While the victim in *Williams* was shot at the scene of the robbery, both victims in the instant case endured the trauma of being kidnapped at gunpoint and threatened by defendant before he killed them. One was also physically abused. The victims were taken to a rural wooded area and forced to get on their knees. Defendant shot one victim in the head at close range after which the other begged for his life. Defendant then callously shot the second victim in the back of the head before fleeing the state with the money from the robbery and the car belonging to one of his victims.

*State v. Lawson*, 310 N.C. 632, 314 S.E.2d 493 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985), also involved the murder of an armed-robbery victim for witness elimination purposes. The victims surprised the defendant while he was in the process of burglarizing

2. Defendant was tried separately for this robbery-murder; *see State v. Williams*, 304 N.C. 394, 284 S.E.2d 437 (1981).

the home of one of the victims. *Id.* at 634, 314 S.E.2d at 495. The defendant shot the first victim in the head when he ran to the patio of his home, killing him. *Id.* The second victim tried to escape in his truck, which got stuck in a ditch. *Id.* at 634, 314 S.E.2d at 496. The defendant forced the second man from his truck and shot him in the head. The second victim survived the defendant's attack. In affirming the defendant's death sentence, this Court noted that both the murder and attempted murder were committed after a "careful, cold and calculated determination that [the defendant] would prefer murdering these persons to risking their being able to testify against him and possibly send him back to prison." *Id.* at 648, 314 S.E.2d at 503.

In the instant case, the facts show that defendant's decision to murder the witnesses was made after more consideration and deliberation than in *Lawson. Lawson* involved the murder of the occupant of a private dwelling during a burglary, when the defendant expected the dwelling to be unoccupied and was unexpectedly surprised by the return of the occupant. In the instant case, defendant intentionally set out to rob the Pantry, which he knew to be occupied by the night clerk. He further kidnapped the victims and drove around Hamlet with them for some time before he drove them to an isolated area and murdered them.

*State v. Gardner*, 311 N.C. 489, 319 S.E.2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985), involved a double murder committed during the course of an armed robbery of a Steak and Ale restaurant. The defendant rang the doorbell after the restaurant had closed and forced his way inside when a bartender answered the door. *Id.* at 494, 319 S.E.2d at 596. Only two employees were present in the restaurant when the defendant obtained entrance. *Id.* Once inside the restaurant, he forced the bartender to hand over the day's cash. *Id.* He saw the other employee start to get up from a chair with what might have been a weapon in his hand. *Id.* The defendant shot the man in the face with his shotgun and then shot the bartender in the neck. *Id.* The defendant left both victims to die and fled the scene. *Id.*

In *Gardner*, the jury found two aggravating circumstances: (i) that the murders had been committed for pecuniary gain; and (ii) that the murders were part of a course of conduct involving the commission of a violent crime against another person. *Id.* at 496, 319 S.E.2d at 597. The jury found two nonstatutory mitigating circumstances: (i) that the defendant's poor family history would reasonably be expect-

ed to contribute to his criminal behavior; and (ii) that the defendant's drug abuse would reasonably be expected to contribute to his criminal behavior. *Id.* In upholding the death sentence in *Gardner,* this Court stressed that these murders "were part of a violent course of conduct, and were coldblooded, calculated, and senseless." *Id.* at 514, 319 S.E.2d at 607.

The murders in the instant case were even more cold-blooded, calculated, and senseless. Further, unlike the defendant in *Gardner,* defendant in the instant case never acknowledged his participation in the murders. Finally, there was no evidence in this case that defendant thought either of the victims may have been armed or that he was provoked in any way.

Finally, this case appears to be very similar to *State v. Robinson,* 336 N.C. 78, 443 S.E.2d 306. In *Robinson,* the defendant deliberately set out to rob a restaurant. *Id.* at 136, 443 S.E.2d at 336. He roamed around the streets of High Point until he found a suitable target. *Id.* He surprised his victims and ordered them back into the store at gunpoint. *Id.* He made two victims lie on the floor and ordered the third to open the safe. *Id.* When the man was initially unable to open the safe, the defendant shot him in the leg. *Id.* at 137, 443 S.E.2d at 336. The defendant forced the man to continue his efforts to open the safe until he was successful; the defendant then stole two money bags out of the safe. *Id.* He then forced the victims to the back of the restaurant, dragging the man he had shot in the leg because he was unable to walk. *Id.* Although his accomplice suggested locking the victims in a meat cooler, the defendant thought for a few moments and then walked around the room and shot all three victims in the back of the head. *Id.* Two of the victims survived.

The jury in *Robinson* found three aggravating circumstances: (i) that the defendant had previously been convicted of a violent felony, (ii) that the murders occurred during the commission of an armed robbery, and (iii) that the murders were part of a course of conduct involving the commission of a violent crime against another person. *Id.* at 137-38, 443 S.E.2d at 336. The jury found nine mitigating circumstances, including the statutory mitigating circumstance that the defendant suffered from a mental or emotional disturbance at the time of the murders. *Id.* at 138, 443 S.E.2d at 336-37.

In affirming the death penalty in *Robinson,* this Court noted that the defendant deliberately decided to kill his victims in spite of other alternatives. *Id.* at 140, 443 S.E.2d at 338. Further, the defendant

STATE v. ALLEN

[339 N.C. 545 (1995)]

never acknowledged his participation in the crime, and there was no evidence that he was ever provoked or threatened by the victims.

In the instant case, the jury found one of the same aggravating circumstances as found in *Robinson*, that the murders were part of a course of conduct involving the commission of a violent crime against another person, and an analogous aggravator, that the murder was for pecuniary gain. As in *Robinson*, defendant in this case decided to kill his victims after cold-blooded and calculated deliberation made while he was driving them around Hamlet in the stolen car. He never acknowledged his participation in the crimes, maintaining that his codefendants committed the murders outside of his presence. Finally, there was no evidence of any provocation or threat to defendant on the part of his victims.

In light of the above, we find that the death penalty in this case is not excessive or disproportionate.

We hold that defendant received a fair trial and capital sentencing proceeding free from prejudicial error. In comparing his case to similar cases in which the death penalty was imposed and in consideration of both the crimes and defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive.

NO ERROR.

Justices LAKE and ORR did not participate in the consideration or decision of this case.